No. 42,412

EDWIN M. CURRY, *Appellee,* v. EDGAR STEWART, aka E. C. Stewart,
KENTON STEWART, aka K. S. Stewart, and OSCAR STEWARD, aka
O. H. Stewart, d/b/a GLOBE CONSTRUCTION COMPANY, *Appellants.*

(368 P. 2d 297)

Opinion filed January 20, 1962.

*Emmet A. Blaes,* of Wichita, argued the cause, and *Roetzel Jochems,
Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom,
Cecil E. Merkel, John W. Brimer, Harry L. Hobson, Bruce W. Zuercher,
Terrance J. Muth* and *Lawrence D. Klenda,* all of Wichita, were with him on
the brief for the appellants.

*Patrick J. Warnick,* of Wichita, argued the cause, and *Alan B. Phares* and
*Keith Eales,* both of Wichita, were with him on the brief for the appellee.

The opinion of the court was delivered by

PRICE, J.: This was an action to rescind a written agreement by
which a partnership was dissolved and for an accounting of profits
accrued after the effective date of dissolution. From a judgment in
favor of plaintiff, defendants have appealed.

The factual background of the matter is this:

In 1913 the defendant, Edgar Stewart, started in the paving con-
tracting business. Two years later his brother, defendant Oscar
Stewart, joined him as a partner, and the business was operated as
the Globe Construction Company. In 1941 Edwin M. Curry, the
plaintiff herein, married Edgar's daughter. In 1942 Curry began
working for the company at a salary of $500 per month. At about
the same time defendant Kenton Stewart, Edgar's son, also com-

menced working for the company at the same salary. On or about August 1, 1946, Edgar and Oscar took Curry and Kenton into the partnership under a general partnership contract wherein each of the partners had a one-fourth interest. It will be seen, therefore, that the partnership consisted of Edgar and Oscar, who were brothers, Kenton, who was Edgar's son, and Curry, who was Edgar's son-in-law. At that time the capital of the partnership amounted to approximately $13,000.

Between 1946 and May, 1957, the partners also engaged in the oil business. These interests were held by the partners individually but were paid for out of partnership funds, and the oil run checks, although made out to the partners individually, were endorsed by them and deposited in the partnership bank account. The partnership prospered, and in the spring of 1957 its assets exceeded $1,000,000.

Prior to 1955 Curry had been a "social drinker," but about that time marital difficulties developed between him and his wife (Edgar's daughter), and from then on his addiction to drink was such that at least on one occasion he was hospitalized in Wichita for alcoholism. It appears that during the entire period in question Edgar was in fact the actual managing partner and that Curry had respect for and confidence in Edgar's ability. It also appears that Curry contributed very little, if any, work or responsibility concerning the operations of the business, and particularly after his drinking problems came about. His marital difficulties did not improve—and in fact became worse—all of which, of course, contributed to the situation with respect to the business. It appears that a number of discussions were held, principally between Edgar and Curry, looking toward some solution of the problem, and apparently it was determined and agreed that insofar as Curry was concerned the partnership should be dissolved.

Early in May, 1957, a partnership dissolution agreement was prepared by the provisions of which Curry was to assign certain of his interests in the partnership to the other three partners and to retain one-half of the property remaining in his name. In consideration of Curry's relinquishment the other partners agreed to hold him harmless on account of any liabilities of the partnership as of the date of dissolution, and further, the interest assigned by him was to be held in trust by the other partners and to be applied to the payment of any alimony or child support judgment that might

be rendered against Curry in the event of a divorce between his wife and him.

On May 13, 1957, pursuant to conversations and an understanding about the matter, Curry appeared at the office of one Mike Taylor, the accountant for the firm, at which time he signed the dissolution agreement in question. On several occasions thereafter (and which will be mentioned later) Curry also executed other instruments in the furtherance of the dissolution.

On September 17, 1957, Curry filed this action to rescind the dissolution agreement and for an accounting. Briefly, his petition alleged that in May, 1957, he was ill, intoxicated and under the influence of sedatives to such an extent that he was in no mental or physical condition to transact business, which fact was well known to the other three defendant partners; that a fiduciary relationship existed between him and Edgar and the other partners, and that in the execution of the dissolution agreement he was overreached and defrauded.

Defendants joined issue with an answer containing specific denials of the wrongdoings alleged in the petition.

Following a full hearing, at which considerable oral evidence and numerous exhibits were introduced, the trial court rendered judgment holding the dissolution agreement to be null and void, and ordered an accounting of the assets and profits of the partnership.

In rendering judgment the court made findings of fact and conclusions of law—which, however, for our purposes need not be set out in detail. Although they covered several phases of the case, it seems clear that they, and the judgment rendered thereon, were premised *basically* on the fact that:

"During the entire month of May, 1957, the plaintiff was mentally incompetent to exercise independent, normal judgment about the transaction of business affairs, or to understand their consequences." (Finding No. 14.)

In their appeal defendants take sharp issue with many of the findings—and particularly with the one above quoted.

At the outset it should be stated that we approach this case with full recognition of the fundamental and universal rule to the effect that our province is to examine the record in the light most favorable to the prevailing party below, that we are not triers of fact, and that when findings of the trial court are supported by competent substantial evidence they are binding and conclusive on appeal.

The phrase "substantial evidence"—while perhaps incapable of

precise definition—has been variously defined as "evidence of substance which induces conviction," and as "evidence affording a substantial basis of fact from which the fact in issue reasonably can be inferred." It also has been said that testimony so completely contradictory that one part destroys the other is not "substantial evidence." (See Words and Phrases, Permanent Edition, Vol. 40.)

In *Weimer v. Sauder Tank Co.*, 184 Kan. 422, 425, 337 P. 2d 672, it was said that the term "substantial evidence," when applied by this court, means evidence possessing something of substance and relevant consequence, and which furnishes substantial basis of fact from which the issues tendered reasonably can be resolved. (See also *In re Estate of Harris*, 166 Kan. 368, 201 P. 2d 1062, and *Barr v. Builders, Inc.*, 179 Kan. 617, 619, 296 P. 2d 1106.)

It is noted that in the finding above quoted—and in other findings and conclusions—the trial court did *not* find that Curry was *intoxicated* or under the *influence of liquor* when he signed the dissolution agreement on May 13, 1957, which is the *crucial* date in this case. The finding is that during the entire month of May he was mentally incompetent to exercise independent normal judgment concerning business affairs or to understand their consequences. The fair and reasonable construction to be given such finding, of course, is that Curry's "incompetence" was the result of his excessive use of liquor over an extended period.

Concededly, in May, 1957, Curry was what may be termed an "alcoholic"—and had been for some time. No one denies such fact, and it undoubtedly brought about the decision to effect a dissolution of the partnership insofar as he was concerned. The rule is, however, that a contract by an alcoholic may not be avoided on that ground—if at the time of its execution he was sober and in possession of his faculties. One's dissipated condition, standing alone, is not itself a ground for avoiding a contract or deed. An habitual drunkard is not necessarily incompetent as a matter of law, and, in the absence of an adjudication finding an habitual drunkard to be incompetent, in order to avoid his contract or deed on the ground of his incompetency it must be shown that his mental condition was such *at the time* the contract or deed was made that he lacked the power of reason and was unable to comprehend the nature and consequences of his act in entering into the contract or executing the deed. (29 Am. Jur., Insane Persons [Habitual Drunkenness], § 85, p. 206.)

In *In re Estate of Crawford,* 176 Kan. 537, 271 P. 2d 240, it was claimed that the grantor in a deed was at the time of its execution physically and mentally incompetent due to the effects of illness, *alcohol* and medicine. The trial court held otherwise, and in affirming the decision this court held (syl. 1) that the test of mental capacity to contract or to convey property is whether the person possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which he is engaged, and (syl. 2) that mere suspicion, conjecture or possibility that undue influence or fraud has induced the execution of a deed is insufficient to establish such fact, and that power, motive and opportunity to exercise undue influence do not alone authorize the inference that such influence was in fact exercised. In the opinion it was said:

"In their brief plaintiffs argue three questions. The first is that the court erred in its general finding that the grantor was mentally competent at the time of execution of the deed. Plaintiff widow of course was not present at the time and her evidence on this question consisted almost entirely of medical testimony and hospital records which clearly established the fact that on numerous occasions, both before and after the day in question, Crawford was undergoing treatment for mental and physical disorders allegedly brought on by the excessive use of alcoholic liquor over a period of years. However, assuming that evidence to be true, the matter still resolves itself into the precise question whether *at the time he signed the deed* Crawford was competent to understand the nature of the transaction. All of the evidence directly bearing on the issue was that he was competent and that at the time was not under the influence of liquor. In *Venable v. Bradbury,* 111 Kan. 495, 207 Pac. 647, it was held:

" 'No invalidity can be predicated on the intemperate habits of the plaintiff where it appears that he was not intoxicated or incapable of understanding what he was doing when the transfers were made.' (Syl. 4.)

"In the exhaustive opinion in *Ismert-Hincke Milling Co. v. Ismert Estate,* 136 Kan. 617, 16 P. 2d 521, the following rule was stated:

" 'The ultimate legal standard of mental capacity to execute a will or promissory note is competency to know and understand the transaction.' (Syl. 1.)" (pp. 540, 541.)

It is quite true that on direct examination Curry testified to the effect that on May 13th he was "pushed" into signing the dissolution agreement, and that he was not afforded the opportunity to have a full understanding of "what was going on." On cross-examination, however, he specifically contradicted those statements. When asked if he wanted the court to understand that he was *drunk* at the time the agreement was executed he replied:

"No, I do not want the Court to understand that I was drunk, but I had

some drinks. I had got up and had some drinks and that was around the house and nobody was there and I played with my dogs."

When asked if he was "fully aware" of what was going on *at the time* the agreement was executed he replied in the *affirmative*. He also testified that on a number of occasions prior to May 13th the matter of dissolving the partnership had been discussed, particularly between him and Edgar. Nowhere in his testimony did he state or contend that he was drunk at the time the agreement was signed.

We find no substantial evidence in the record to support the proposition that at the time and place in question Curry was *intoxicated*, or to support the finding by the court of *incompetency* at the time and place in question such as to avoid the agreement.

And aside from what has been said, we think there is still another compelling reason why the judgment of the trial court cannot be upheld.

The undisputed facts of record are that subsequent to May 13th Curry did a number of things which show clearly that he understood and ratified the entire transaction. On May 14th he returned to the office of accountant Taylor to secure a copy of the dissolution agreement. On May 17th he again went to the accountant's office and executed an assignment of an interest in a gasoline plant pursuant to the terms of the agreement. On several occasions thereafter he signed transfer orders pursuant to the agreement. On July 30th, in the presence of his brother, who was a banker, he signed further transfer orders pursuant to the agreement. And, as urged by defendants, perhaps even more important to show ratification is the fact that he received the oil run payments individually and mingled those funds with his regular bank account. He did this for several months—thus showing his satisfaction and evidencing his intention to ratify the agreement. In addition to using the proceeds from the agreement "to live on," he paid his own proportionate share of the operating expenses on the oil and gas interests retained by him pursuant to the agreement. Prior to the execution of the agreement those expenses were paid from the partnership account.

On the matter of ratification and waiver of right to rescind a contract see *Trust Co. v. McIntosh*, 68 Kan. 452, 458, 75 Pac. 498, 1 Ann. Cas. 906, and *Morse v. Kogle*, 162 Kan. 558, 178 P. 2d 275, where it was held:

"If, after discovery or knowledge of facts which would entitle a party to a contract to rescind the contract, he treats the contract as binding and leads

the other party to believe that the contract is still in effect, he will have waived his right to rescind." (Syl. 2.)

See also 12 Am. Jur., Contracts, § 449, p. 1030, and that portion of the annotation "Intoxication As Ground For Avoiding Contract," 36 A. L. R. 619, at p. 625, where it is said:

"If a person who enters into a contract while he is intoxicated fails to disaffirm the agreement within a reasonable time after he becomes sober and has full knowledge of what he has done, he thereby ratifies the contract and is bound thereby."

Reference also is made to § 23 of the annotation "Ineffective Conveyance—Ratification," 7 A. L. R. 2d 294, at p. 325.

Assuming—but by no means conceding—that the facts and circumstances surrounding the execution of the dissolution agreement on May 13th were such as to provide sufficient grounds for its avoidance, the record makes it clear that by his subsequent acts Curry ratified its terms and provisions and waived any pretended right that he may have had to rescind.

As previously stated—although the trial court's findings and conclusions covered several different phases of the case, and which are urged by Curry in support of the judgment—it is very clear that the *basic premise* upon which this action was filed, tried and decided, is that *at the time the dissolution agreement was executed on May 13, 1957,* Curry was *intoxicated* or else was so *incompetent* due to the excessive use of liquor over an extended period that he was unable to understand and transact business affairs. As also stated—we find no substantial evidence in the record to support either proposition. Furthermore, assuming, solely for the sake of argument, there were infirmities in the execution of the agreement sufficient to avoid it—Curry, by his subsequent acts, ratified it and waived any rights he may have had for rescission.

Other contentions in support of the judgment have been considered, but, in view of the facts shown by the record, are held to be without merit. No useful purpose would be served by extending this opinion. The judgment is reversed with directions to enter judgment in favor of defendants.