No. 46,470

Robert Aaron Moore, and Thelma Ruth Moore, *Appellees*, v. Farm & Ranch Life Insurance Company, Inc., *Appellant*.

(505 P. 2d 666)

Opinion filed January 20, 1973.

*Joseph W. Kennedy*, of Morris, Laing, Evans & Brock, Chartered, of Wichita, argued the cause, and *Robert I. Guenthner*, of the same firm was with him on the brief for appellant.

*Donald Vsetecka*, of Corley, Braun & Smith, of Garden City, argued the cause, and *Lelyn J. Braun*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

Fatzer, C. J.: This was an action to recover premiums paid on insurance policies alleged to have been sold by misrepresentations of the company agent as to the benefits to be received under the policies.

The case was tried to the court without a jury. Judgment was rendered in favor of the plaintiffs and the defendant has appealed.

The appellant, Farm & Ranch Life Insurance Company, Inc. (insurance company), contends the district court erred in granting judgment for the appellees, Robert Aaron Moore and Thelma Ruth Moore, husband and wife (hereafter referred to as the Moores, the appellees, Robert or Thelma), because the testimony shows as a matter of law their claim for relief is barred by the applicable

statute of limitations; that appellees have waived any right to relief, and that they have ratified all of the transactions on which they base their claim. The appellant also objects to certain findings of the district court as not being supported by the evidence.

While the appellant claims as error the failure of the district court to grant summary judgment on the pretrial depositions, there is no material conflict between the depositions and the oral testimony, and it would serve no useful purpose to make a separate presentation of that particular issue.

The posture of the case now before us presents factual questions. The appellees reside near Ulysses, in Grant County. Robert was 46 years of age, a high school graduate and a farmer who owns and operates his own farm. Thelma was 39 years of age, a high school graduate, and assisted her husband in the farming operation. The appellees were at all times material hereto familiar with the operation of corporations as business entities and understood that dividends are paid out of the profits of a corporation as determined by the board of directors thereof.

The appellant is a Kansas corporation duly licensed and qualified to carry on the insurance business within the state of Kansas.

Prior to January 12, 1966, John Foster, an agent of the appellant, called Robert late one evening and told him he had been recommended by Howard Phifer, a resident of Ulysses, who thought he would be interested in what the agent had to sell, and asked if he would like to make some money. Robert said he was interested and they arranged a meeting. On January 12, 1966, Foster called on Robert and Thelma at their farm home and presented them with a letter of introduction from Howard Phifer. Foster spent between three and four hours with the Moores that evening. Thelma testified:

"Mr. Foster told us that this was an investment plan that would be offered to a limited number of people in each county. He said that we were going to receive dividends of at least 10%, that they had already paid a 10% dividend that year, that they were going to pay 16%, and that the dividends would continue to grow. This investment plan also had some life insurance in it and all our premiums would be returned. In a few years the policy would be paying for itself and after that it would be more than paying for itself so we would actually get back money over and above our premium.

"He said this was like stock in a company and in the Ulysses Co-op in that we were going to share all of the earnings of the company. The company had applied to expand into other states and we would share in these earnings. Only the people who had the investment plan would share in these earnings.

"He told us that in addition to this investment plan we would have an insurance policy.

"He told us that at the beginning there would be a large amount of insurance which would decrease in amount with time. But as the life insurance decreased the dividends and the return premium benefit would be there. We were going to get all our money back; all the premiums we paid in we would get back at death. He showed us a policy he had with him on his own life, but he did not go over it in detail or read all the paragraphs to us.

"He pointed out his return premium benefits and that the dividends were going to start at 10% the second year. We were led to believe that the 10% would be on the accumulated investment."

Based upon the above representations, the Moores purchased seven policies covering each of them and each of their five children, ranging in ages from five to fourteen years. The annual premiums totaling $2,345.57 were paid. The seven policies were later delivered to the Moores and placed in a filing cabinet. They did not read the policies, but took Foster's word as to what they stated.

After hearing a conversation relative to a newspaper article to the effect that persons buying Farm & Ranch Life Insurance Company's policies were not getting what they thought, Thelma, on July 28, 1966, wrote to the Insurance Commissioner of the State of Kansas, and enclosed for his analysis one of the policies purchased on January 12, 1966.

In that letter Thelma complained of the policies having been misrepresented to them by Foster and stated they had been led to believe they were purchasing stock with guaranteed dividends. Shortly after July 28, 1966, the Insurance Commissioner wrote Thelma explaining that a life insurance policy was not stock in the life insurance company and that all dividends paid on such a policy were subject to the discretion of the board of directors of such life insurance company.

In January, 1967, when the second annual premium came due on the seven policies purchased by the Moores, they determined not to pay the premiums. As a result of non-payment of the premiums, the policies lapsed. On July 7, 1967, Merle Hoppe and Bill Quillen, agents of the appellant, visited the Moores' home. At that time Hoppe and Quillen spent several hours with the Moores going over the policies and particularly the provisions relating to dividend benefits. They told the Moores that no doubt they would get their premiums back, that the dividends were so very good that they could not afford to drop the policies. Based upon those statements, the Moores paid the second annual premium. Later, they were told

by their neighbors that before a return of premium would be available on those policies of insurance, the insured had to die before the age of 65. More letters were then written by Thelma attempting to secure explanations from the company.

Prior to January 18, 1968, the Moores received notice from the appellant that dividends on their policies had been declared but in accordance with instructions from the Moores the dividends were being used to purchase additional insurance. On January 18, 1968, Thelma wrote the appellant seeking clarification of the basis upon which dividends were paid. On January 23, 1968, the appellant responded and explained that the company paid a dividend of 11% in 1967. Thereupon, the Moores paid the third annual premium.

Subsequently, the Moores became dissatisfied with their policies and wrote to the appellant on March 26, and March 30, 1968, complaining primarily of the fact that they did not own stock in the company and that the dividends were not guaranteed. They stated they had been led to believe they would receive the return of all premiums paid on their life insurance no matter when they died, and that they had not been advised they would have to die prior to the contract anniversary date nearest their 65th birthdate in order to receive the benefits.

On May 29, 1968, Hoppe again visited with the Moores in an attempt to get them to reinstate the policies or in the alternative to secure other insurance. When informed they had sought legal counsel he encouraged them not to continue to seek legal aid but rather to write the president of the company, which Thelma did.

On January 7, 1969, this action was brought to recover the three annual premiums paid on the seven policies in the total amount of $7,042.71; mental anguish, pain and suffering, $5,000, and punitive damages including attorney fees in the further sum of $7,500. On January 13, 1969, Mr. Leland J. Braun, the Moores' attorney, wrote the appellant at their request, and demanded payment of all accrued interest and dividends. The letter reads:

"Gentlemen:

"For and in behalf of the owners of the above entitled policies we are herewith requesting that all accrued interest and dividends on each and every one of the above policies be paid to the owners in care of this firm in cash. Further, we are to advise you that the owners will not pay the premiums on the anniversary date and are considering the policies cancelled in light of the further action that will be taken.

"Yours very truly,
"Leland J. Braun"

On January 10, 1969, the appellant issued seven checks, one on each of the insurance policies, representing the dividends earned during the year 1968. The checks were mailed to Mr. Braun, and on January 21, 1969, they were endorsed and cashed by the Moores. The proceeds from the checks and the seven insurance policies were retained by the Moores. Thelma testified:

"A. . . . In January 1969 we had Mr. Braun, representing us, demand payment of the dividends on these policies. We received a dividend check on each policy after this lawsuit was filed. On January 1, 1969, we knew we did not have stock in the company, that the dividends were not guaranteed, and that in order to obtain the return of premium benefit we had to die before age 65.

"Q. And yet knowing all of that you still demanded, received, and accepted benefits under each of these policies, didn't you?

"A. Yes, because we had paid our premiums and we were entitled to those.

"Q. Oh, you were actually wanting the benefits that you were entitled to under the contract?

"A. Well, we felt we were entitled to those and so we asked for them.

"Q. Well, you felt that the contract were in force, didn't you?

"A. Yes, we had paid our premium.

"Q. Right, and had you died any time up to that point you would have expected to receive a death benefit, would you not?

"A. I imagine, we paid our premiums.

"Q. So you were treating the contracts and insurance policies as in force at that time, were you not?

"A. Yes. As we understood them we were to get back all premium benefits and that is the reason why we paid our second two premiums.

"Q. We're talking now about a time, January, 1969, quite a while after you had discovered any alleged misrepresentation. I think you said that you found out in February of '68 that the return of premium benefit did not apply if you died after age 65, isn't that true?

"A. It was in February or March.

"Q. February or March?

"A. Yes.

"Q. And after that date you negotiated with the company to convert those policies to other policies, didn't you?

"A. Pardon?

"Q. After that date that you found that out you still went ahead and negotiated with the company to convert those policies, didn't you?

"A. Yes.

"Q. You retained possession of them, didn't you?

"A. Yes.

"Q. In fact you retained possession of them until today when you brought them to Court?

"A. Yes.

"Q. Did you ever send them back to the company and didn't want them any more and they were canceled?

"A. No.

"Q. And in January of '68 ['69] you demanded, received, and accepted benefits under those policies, didn't you, for dividends due?

"A. Yes.

The district court made findings in harmony with the facts stated, and concluded, in part:

"(1) From the above detailed testimony, this Court concludes that John Foster, salesman and agent by means of a preferential local connection with Mr. Phifer, innuendoes and puffing knowingly led the plaintiffs to falsely believe as an introductory and influential contact, they were receiving stock and insurance in a rapidly growing company. After the initial payment of two or three premiums the earnings from investment would, based on the company's past operations, take care of all future premiums; and the plaintiffs would have paid up insurance for $5,000.00 on each of the seven family members of the respective age of 65 years with decreasing term death benefits.

"(2) The plaintiffs apparently did not realize that in order to receive the decreasing term death benefits and to carry out in full the contract terms they would pay as premiums many times the paid up face value of the policies. The agent, Mr. Foster, as a result of the several hours of conversation together with the general set up well knew and realized that the Moores had received such false impressions, which he planned and expected but was particularly careful to stay within the law as he interpreted it.

"(3) The plaintiffs, through hearsay from their neighbors, became suspicious and after receiving a reply to their letter from the Commissioner of Insurance, informed the defendant they were not going to pay the second premium and asked for a return of their money.

"(4) Thereupon, officers of the defendant took advantage of the gullible but human factor that plaintiffs were exceptionally vulnerable in their desire not to lose their investment of $2347.57. They personally called on the Moores and, by assuring them that they had and were making a good investment, persuaded them to pay the second premium and with subsequent calls also persuaded them to pay the third premium. The overall tactics, including the insurance policy itself, has the appearance of the old come-on game.

"(5) The Court further concludes that the defendant's actions, from the inception of its first contacts made in Grant County and continuing until 1968 when the plaintiffs first consulted a lawyer, constituted actual and continuing fraud on the plaintiffs which entitled plaintiffs to rescission of the insurance contracts but which has elapsed by non-payment of subsequent premiums. Thus, plaintiffs are entitled to judgment for restitution in the amount of $7,042.71, less $553.47 paid to plaintiffs on January 13, 1969, at the request of plaintiffs' attorney.

"(6) This Court does not construe the receipt of the $553.47 as an act invoking the rule of estoppel since the attorney's demand made it clear that further action would be taken. It was an offset rather than a benefit. The continuing and persuasive actions by the defendant's employees indicate they

were well informed of the equitable rules that required plaintiffs to act promptly in order to rescind the contract and that the acceptance of any benefits under the contract would act as an estoppel in a suit for cancellation as well as the statute of limitations. As a summary, this Court concludes it would be unconscionable to apply the doctrines of prompt rescission and estoppel in this case."

The district court deducted the dividend payment made for 1968, in the amount of $553.47, and rendered judgment for the plaintiffs, appellees here, in the amount of $6,489.24.

We now turn to the specific questions raised by the appellant.

It will suffice to state that the question as to the sufficiency of the evidence to support the district court's findings, and the question of when the fraud was discovered starting the running of the statute of limitations, require the weighing of evidence, the consideration of the credibility of witnesses, and inferences to be drawn from the testimony. These are matters which an appellate court may not consider on appeal.

Without detailed consideration of the above questions, we turn to the next issue on which there is no conflict in the testimony or dispute as to the facts. Did the appellees waive any right to relief and ratify all transactions on which the action was brought?

Appellees testified to three distinct representations which they claimed to be fraudulent—(1) appellees would own stock in the company; (2) the dividends would be guaranteed, and (3) that a return premium benefit would be paid even though the insured died after the age 65.

As early as the summer of 1966, the Moores learned through correspondence with the Kansas Insurance Commissioner that they owned no stock in the company and that the dividends were not guaranteed. They based this action on the alleged false representation that there would be a return of premiums as well as the payment of $5,000 face value of each policy, even though the insured died after age 65.

The appellees admit the discovery in February or March, 1968, that there would not be a return of premiums if the insured died after age 65. Yet they waited until January 7, 1969, to file an action for the return of the premiums paid over the three-year period. They did so to reap the full benefit available under the seven policies. Although repetitious, we quote again Thelma's testimony on the point:

"Q. And yet knowing all of that you still demanded, received, and accepted benefits under each of those policies, didn't you?

"A. Yes, because we had paid our premiums and were entitled to those.

"Q. Oh, you were actually wanting the benefits that you were entitled to under the contract?

"A. Well, we felt we were entitled to those and so we asked for them.

"Q. Well, you felt that the contracts were in force, didn't you?

"A. Yes, we had paid our premium.

"Q. Right, and had you died any time up to that point you would have expected to receive a death benefit, would you not?

"A. I imagine, we paid our premiums."

Even after filing this action, they demanded and received the dividends due under the policies for the year 1968.

This court is compelled to agree with the appellant's contention that the appellees by their conduct waived any right to relief they may have had because of misrepresentations in the sale of the insurance contracts and their purchase thereof.

In *Cleaves v. Thompson*, 122 Kan. 43, 251 Pac. 429, this court held:

"Where a party desires to rescind a contract on the ground of fraud and misrepresentations, he must, upon discovery of the facts, at once or within a reasonable time, announce his purpose and adhere to it." (Syl. ¶ 1.)

If a party be silent and continue to treat a contract as valid until he has received all of the benefits thereunder, he will be held to have waived any claim of fraud. *Morse v. Kogle*, 162 Kan. 558, 178 P. 2d 275, is one of the leading cases on the issue here presented. There it was held:

"One who seeks to rescind a contract on the grounds of fraud must do so with reasonable promptness after discovery of the fraud.

"If, after discovery or knowledge of facts which would entitle a party to a contract to rescind the contract, he treats the contract as binding and leads the other party to believe that the contract is still in effect, he will have waived his right to rescind.

"In order to constitute such a waiver, it is not necessary that there be an express ratification of the contract after discovery of the fraud which might make the equitable remedy of rescission available. Acts or conduct inconsistent with an intention to rescind it, or in recognition of the contract, may have the effect of affirming it." (Syl. ¶¶ 1, 2, 3.)

The rule stated in *Morse* was also followed in *Curry v. Stewart*, 189 Kan. 153, 368 P. 2d 297. In *Nichols Co. v. Meredith*, 192 Kan. 648, 391 P. 2d 136, it was said:

"In *Morse v. Kogle*, 162 Kan. 558, 178 P. 2d 275, this court, in a well-annotated opinion discussing the right to rescind a contract for fraud, stated it

was well settled that one who seeks to rescind a contract for fraud must do so promptly upon discovery of the fraud, and if by words or conduct he treats the contract as binding after having knowledge of the fraud, he thereby affirms the contract and cannot rescind. It was further stated that ordinarily an express ratification is not necessary in order to defeat the remedy of rescission. Acts or conduct, inconsistent with an intention to avoid it, or in recognition of the contract, have the effect of an election to affirm it. For cases cited supporting the mentioned rules of law and other applicable rules see *Cleaves v. Thompson*, 122 Kan. 43, 251 Pac. 429; *Turner v. Jarboe*, 151 Kan. 587, 100 P. 2d 675; *Wells v. Albers*, 122 Kan. 643, 253 Pac. 412; *Dobie v. Sears Roebuck & Co.*, 164 Va. 464, 180 S. E. 289, 107 A. L. R. 1026; and *McLean v. Clapp*, 141 U. S. 429, 12 S. Ct. 29, 35 L. Ed. 804. Only recently in *Brown v. Wolberg*, 181 Kan. 919, 317 P. 2d 444, we again emphasized the equitable remedy of rescission is open only to the diligent, and one who seeks to rescind a contract on the ground of fraud and misrepresentation must do so with reasonable promptness after the discovery of the fraud." (l. c. 653.)

It does not matter whether the court is dealing with waiver, ratification, or equitable estoppel, a party will not be permitted to accept the benefit of a contract, with full knowledge of all of the facts, and then deny his own responsibility thereunder. (*Bank v. Jesch*, 99 Kan. 797, 163 Pac. 150.) See, also, *Pattison v. State Farm Fire & Casualty Co.*, 209 Kan. 167, 172, 495 P. 2d 975, and *Thompson v. Anderson*, 209 Kan. 547, 556, 498 P. 2d 1.

The judgment is reversed with instructions to the district court to enter judgment for the appellant.

KAUL, J., dissenting: Essentially, the issues in this case are factual. In my view of the record there was evidence supporting the trial court's findings; therefore I would affirm the judgment.