No. 47,745

ROBERT L. PRATHER, *Appellant*, v. COLORADO OIL & GAS CORP., *Appellee.*

(542 P. 2d 297)

Opinion filed November 8, 1975.

*Russell E. Grant,* of Saums and Grant, of Wichita, argued the cause, and was on the brief for the appellant.

*Joseph W. Kennedy,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Ken M. Peterson,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action for damages by Robert Prather (plaintiff-appellant) against the Colorado Oil and Gas Corporation, d/b/a Derby Refining Company (defendant-appellee) for termi-

nating a sublease to a Derby gas station in Wichita, Kansas. Appeal has been duly perfected by the plaintiff from the trial court's order sustaining the defendant's motion for summary judgment.

The defendant (hereinafter Derby) defends on two grounds: First, that no valid written sublease was in force; and second, that the plaintiff ratified the defendant's termination of the sublease.

The motion for summary judgment was submitted to the trial court on the files, the pleadings, the request for admissions and the reply thereto and the deposition testimony of the plaintiff, Mr. Prather. Derby relies primarily upon the admissions and the deposition testimony of Mr. Prather.

Reviewing the record, as we must on a motion for summary judgment, it discloses Robert Prather had operated various gas stations since 1959. From September 1970 until April 1973 he subleased a Derby gas station at 3001 South Broadway in Wichita. In April of 1973 Derby officials decided to close the South Broadway station because the property owner wished to retake possession of the property. Mr. Wille, Derby's field supervisor, discussed with Mr. Prather the leasing of Derby's station No. 9193 located at 1001 West 31st Street South. At that time Mr. Wille unsuccessfully tried to convince Mr. Prather to operate the station as a self-service station.

On April 8 or 9, 1973, Mr. Prather entered into a mutual cancellation of his sublease agreement on his South Broadway station and signed a one year sublease on the West 31st Street station, No. 9193, on the form lease submitted to him by Mr. Wille. Mr. Prather thought this sublease agreement was the same normal service station sublease as on the South Broadway station. The South Broadway sublease required Mr. Prather to deposit with Derby the sum of $500 as security for faithful performance. This $500 was not returned to Mr. Prather upon the cancellation of the South Broadway sublease, but was retained by Derby and applied to the deposit on the new sublease of the West 31st Street station, No. 9193. The West 31st Street station sublease, submitted as an exhibit to the trial court, required Mr. Prather to deposit the sum of $1,000 as security for faithful performance. This fact was never called to Mr. Prather's attention, and he was not aware of it.

At the time Mr. Prather signed the West 31st Street station sublease, Mr. Wille had informed Mr. Prather that Derby had changed its mind about running the station on a self-service basis—that

Derby was going ahead to operate it as a leasing operation. Mr. Prather thought Mr. Wille signed the sublease on the 31st Street station when he signed it.

The terms of the South Broadway service station sublease under which Mr. Prather had been operating required Derby to supply the products for sale. Mr. Prather's profit on gasoline was five and one-half cents on regular gasoline and six cents on premium gasoline. Derby received two cents per gallon as rental. Mr. Prather was required to carry workmen's compensation insurance and public liability insurance coverage in the amounts specified in the lease.

Upon Mr. Prather's taking possession of the West 31st Street station No. 9193, operations under the new sublease were carried on in the same manner as at the prior station. Mr. Prather provided the insurance which was approved by Derby officials. Derby supplied the products and the profits from these sales were computed and paid upon the same basis as under the prior sublease. From April 10, 1973, to June 27, 1973, Mr. Prather operated station No. 9193 as a sublessee of Derby's without major controversy. The only disagreement between the parties arose in May of 1973 after Derby installed some self-service pumps, but did not convert his station to a completely self-service station. Although this action is not directly involved in the present controversy, a provision in the lease reads:

"None of the provisions of the lease shall be construed as reserving to the LESSOR [Derby] any right to exercise any control over the business or operations of the LESSEE conducted upon the leased premises, or to direct in any respect the manner in which any such business and operations shall be conducted, it being understood and agreed that so long as the LESSEE shall use said premises in a lawful manner as herein provided and complies with the full terms and conditions of the lease agreement, the entire control and direction of the activities of the business carried on within said premises shall be and remain with the LESSEE."

On June 25, 1973, Derby officials informed Mr. Prather they wanted to convert his station to a completely self-service station. They offered him a position as manager at a salary of $550 to $600 per month, which was less than Mr. Prather was making as a sublessee. Mr. Prather testified the Derby officials at first said he could decide whether to convert to a completely self-service station. But on June 26, 1973, the Derby officials made a unilateral decision to convert to a self-service station. They approached Mr. Prather at his home and informed him for the first time the sublease he signed in the field was not signed in Derby's office. They told Mr. Prather,

a high school graduate, he did not have a lease. Mr. Prather's narrative deposition testimony on this point was as follows:

"And at that time Mr. Burch told me that I did not have a lease, and, of course, this kind of floored me, and I said, 'Well, I signed a lease.' And he stated, 'Well, it was signed in the field but it was not signed in the office, so consequently you don't have a lease.' That Mr. Burch and Mr. Glass and myself were present at this time and nobody else. . . .

"Of course, like I say, it floored me, the fact that I didn't have a lease. And I got up the normal time in the morning and went down to open up on the 27th and Mr. Burch was sitting there waiting for me when I arrived. And he says, 'What have you decided?' and I said, 'Well, I really haven't decided anything.' You know, I still can't afford to go to work for Derby Oil Company.

"Mr. Glass arrived approximately 8:00, shortly after, and they had a conversation between themselves that I couldn't hear because I was waiting on customers. Mr. Burch then left and Mr. Glass asked me again what I had decided and I said I still wanted to live up to the lease and was more or less ignored, and Mr. Glass went out and started auditing the pumps, which was reading the pump. . . ."

Thus, on June 27, 1973, when Mr. Prather went to work Derby officials retook possession of his station, audited the pumps, and hired his employee to run the station. Mr. Prather signed the final audit document, relinquished his keys to the Derby officials, supplied $75 of his cash for making change, supplied the combination to the safe, agreed to sell his small amount of equipment and left the station. Mr. Prather admits no physical force or threats were used, but he justifies his leaving as avoiding a fight. He testified:

". . . As far as I am concerned, force-wise, they just come in and took over. I am not going to stand there and have a fist fight in the office with any of them. That's kind of ridiculous, a man of my age. We did not come to blows, no. They never touched me. *They come in and took over the station without asking me that they may have it.* They hired my help out from underneath me, and there's nothing that I could do about it unless I wanted to start a fist fight with one of them, which like I say, I don't feel a man of my age has got any business starting a fight with anybody. . . ." (Emphasis added.)

Ninety days later Derby officials sent Mr. Prather a check for $626.11 which he cashed. This represented a $500 security deposit on the station, commissions from sales and the value of Mr. Prather's equipment left at the station less credit card charge-backs.

In his reply to Derby's request for admissions Mr. Prather stated:

"12. It is admitted that I received a check in the amount of $626.11 from the defendant. Said check insofar as I am aware, represented my security deposit in the amount of $500.00 and commissions earned by myself for oil and other products, prior to the taking over of the station by defendant. I

cashed the check voluntarily, it was sent to me, I made no demand for it, it was my money which I needed at the time, and I had been advised by defendant that I did not have a lease and I had not been told otherwise at that time. It is denied by me that at the time of cashing said check that I was aware of any rights that I may of had and that I had been defrauded out of the possession of the service station. It is admitted that I was aware at the time of the facts that occurred."

Based upon the foregoing admission of Mr. Prather, Derby attempts to sustain the judgment of the trial court. Derby contends Mr. Prather, with full knowledge of the facts, voluntarily accepted the return of the security deposit held by Derby under the sublease, and voluntarily accepted payment for goods sold to Derby as part of the transaction alleged to constitute a wrongful termination on the sublease, and therefore, by such conduct waived any claim he might have had against Derby.

Mr. Prather's petition sought damages in the sum of $14,000 for loss of income, the sum of $200,000 for loss of future earnings, profits and goodwill and the sum of $1,000,000 for punitive damages. The petition alleges that Derby by and through its officers, agents and employees, did wilfully, maliciously, and with force and duress, terminate his possession of Derby station No. 9193 by false and fraudulent acts in failing to execute the written lease agreement, which Derby presented to him upon his entering into possession of said premises, and by further representing to him that he did not have a lease agreement with Derby, and by the use of force and duress in taking over possession of said service station premises, with intent and purpose to convert said premises to its own use and purposes. The trial court later permitted Mr. Prather to amend his petition to include an allegation that the acts and conduct of Derby were oppressive.

Derby's brief says for the purposes of this appeal we must assume what Mr. Prather says is true, that he did have a one year sublease on station No. 9193, that Derby "took over" the station on June 27, 1973, and that this was done without his consent. Thereupon Derby argues that after assuming all this there is no basis whatsoever for a charge of fraud against Derby simply because no facts alleged in Mr. Prather's petition, nor any testimony given at his deposition, remotely tend to substantiate the charge. Derby argues the only representation complained of is that Derby's employees told Mr. Prather that Derby had not signed the sublease, which was true.

As we read Derby's brief, this maneuver on their part to recognize

that Mr. Prather had a valid sublease on station No. 9193, attempts to hurdle the issue of fraud. An issue of fact to be determined in the trial court was whether Mr. Prather had a sublease on station No. 9193. If from the evidence it is established that Mr. Prather had a sublease, the conclusion is inescapable that the representation by Derby's officials to Mr. Prather that he had no lease was false. And, if it was false, Mr. Prather was induced to act upon such false premise in relinquishing possession of the station as he did, and in accepting and cashing the $626.11 check from Derby.

When Mr. Prather cashed the $626.11 check he was still laboring under the belief he had no lease. He said in his answer to request for admissions, "I had not been told otherwise at that time."

Derby argues that at the very time when the Derby employee was "taking over" station No. 9193 by auditing the pumps, Mr. Prather was selling Derby cash, mops, brooms and other items which he knew would be used in the continued operation of the station. It is contended the act of Mr. Prather in selling such items to Derby was part and parcel of, and cannot be separated from, Derby's act of "taking over" the station. It is argued that when Mr. Prather accepted payment for those items, some 90 days later, with full knowledge of the facts, he thereby ratified the entire transaction and waived any claim he might have had against Derby. (Citing, *Jones v. Jones,* 161 Kan. 284, 292, 167 P. 2d 634.)

For the reasons hereafter assigned we think Derby's position is untenable.

Once a valid sublease on the West 31st Street station, No. 9193 is found to exist between Derby and Mr. Prather, Derby is bound by its provisions, and cannot interfere with the sublease and defeat Mr. Prather's rights. (See, 49 Am. Jur. 2d, Landlord and Tenant, § 47, p. 89 and § 280, p. 293.) The lease of a gasoline service station is generally governed by the principles of law and equity applicable to all leases. (Annots., 83 A. L. R. 1416 [1933] and 126 A. L. R. 1375 [1940].)

Thus, when Derby as lessor "took over" the possession of the station in question Mr. Prather had a cause of action for breach of the sublease.

The next question is whether Mr. Prather has waived, or ratified the breach, or is estopped to seek redress in damages from Derby.

On the record here presented great importance cannot be attached to Mr. Prather's alleged acquiescence in the take-over.

Actual ouster or physical dispossession is no longer necessary. (49 Am. Jur. 2d, Landlord and Tenant, § 301, p. 316.) Forceful ejectment is not required to perfect legal rights. Thus in *Woods v. Kirby*, 238 Ark. 382, 382 S. W. 2d 4 (1964) a farm tenant was held not to have waived his claim for damages for wrongful eviction by voluntarily surrendering possession of the land instead of waiting to be ousted by the sheriff.

Derby contends Mr. Prather's acceptance of the $626.11 check with full knowledge of past events is a conclusive bar to his damage suit. Theories of ratification, waiver and estoppel are said to support the appellee. As a general legal principle Mr. Prather's actions fall short on all of these theories.

Ratification has been defined as the acceptance of the result of an act with an intent to ratify, and with full knowledge of all the material circumstances. (*Frazier v. Railway Co.*, 97 Kan. 285, 288, 154 Pac. 1022; and *Porterfield v. Farmers Exchange Bank*, 327 Mo. 640, 37 S. W. 2d 936 [1931].) Here the appellant's deposition testimony does not establish the critical intent required to ratify. Mr. Prather was falsely told he had no contract, and believing the representation to be true he responded as if he had no valid sublease.

For the same reason Mr. Prather's actions fall short of waiver, which has been defined as the intentional relinquishment of a known right. (*Schneider v. Washington National Ins. Co.*, 200 Kan. 380, 398, 437 P. 2d 798; *Jones v. Jones*, 215 Kan. 102, 116, 523 P. 2d 743, cert. denied, 419 U. S. 1032, 42 L. Ed. 2d 307, 95 S. Ct. 515; and *Flott v. Wenger Mixer Manufacturing* Co., 189 Kan. 80, 90, 367 P. 2d 44.) The intent to waive known rights is essential.

Equitable estoppel is nonconsensual in nature. Estoppel is recognized to defeat the inequitable intent of the party estopped. (*Flott v. Wenger Mixer Manufacturing Co.*, supra.) As a general rule, only the innocent may invoke estoppel. (*Jefferson Life & Cas. Co. v. Johnson*, 238 Miss. 878, 120 So. 2d 160 [1960]; and 28 Am. Jur. 2d, Estoppel and Waiver, § 79, p. 719.) This court has indicated one must act in good faith to invoke estoppel. (*Board of County Commissioners v. Brown*, 183 Kan. 19, 325 P. 2d 382.)

The elements of equitable estoppel are well defined in *Place v. Place*, 207 Kan. 734, 739, 486 P. 2d 1354. Here we do not have a similar fact situation and Derby does not contend in its brief the doctrine of equitable estoppel is applicable to this case. In the posture which this case comes before the court Derby is not an innocent party.

Even if Derby qualified as an innocent party, the mere cashing of a check for liquidated sums of money due or for money previously earned, whose value is not disputed, is not an estoppel in every case. (*Harrison v. Henderson,* 67 Kan. 194, 72 Pac. 875.)

Mr. Prather's statement that the check was not intended to constitute a release and that it was not accepted as a release must be accepted as true for purposes of this appeal. (*Manning v. Woods, Inc.,* 182 Kan. 640, 324 P. 2d 136.) Issuable facts are joined by the pleadings and the appellant is entitled to a determination of the same by a trial of the facts. (*Manning v. Woods, Inc.,* supra. See also, *Asher v. Greenleaf,* 68 Kan. 29, 32, 74 Pac. 633; *Barnes v. Mid-Continent Casualty Co.,* 192 Kan. 401, 388 P. 2d 642; *Kohn v. Babb,* 204 Kan. 245, 252, 461 P. 2d 775; and *Amino Brothers Co. Inc. v. Twin Caney Watershed District,* 206 Kan. 68, 476 P. 2d 228.)

In support of its argument Derby relies on *Moore v. Farm & Ranch Life Ins. Co.,* 211 Kan. 10, 505 P. 2d 666. There the Moores sought to recover from Farm and Ranch Insurance Company damages for misrepresentation in the sale of life insurance policies. After the Moores *had discovered all of the facts, including the fraud,* which may have entitled them to recovery, they made payments under the contract, testified they regarded the insurance as binding and in force, and demanded and received insurance dividends due under the policy. Taken as a whole this court held the Moores had waived their right to recover. The court used the following language:

"This court is compelled to agree with the appellant's contention that the appellees by their conduct waived any right to relief they may have had because of misrepresentations in the sale of the insurance contracts and their purchase thereof.

❖   ❖   ❖   ❖   ❖

"It does not matter whether the court is dealing with waiver, ratification, or equitable estoppel, a party will not be permitted to accept the benefit of a contract, with full knowledge of all of the facts, and then deny his own responsibility thereunder. (*Bank v. Jesch,* 99 Kan. 797, 163 Pac. 150.) See, also, *Pattison v. State Farm Fire & Casualty Co.,* 209 Kan. 167, 172, 495 P. 2d 975, and *Thompson v. Anderson,* 209 Kan. 547, 556, 498 P. 2d 1." (pp. 17, 18.)

The *Moore* case is easily distinguished from the facts here because the Moores knew of the fraud practiced upon them when they accepted further benefits under the insurance contracts. Here Mr. Prather did not know of the fraud—the fact that he did have a valid contract—when he was told by Derby officials that he had no contract.

A case directly in point is *Wolf v. Brungardt*, 215 Kan. 272, 524 P. 2d 726, where the court said:

"Where, under all of the circumstances of the case, there is nothing to put the appellees on inquiry they may continue to rely on the representations made by the appellants. The appellees did not have a duty to investigate further. There would seem to be little doubt that while, in the ordinary business transactions of life, men are expected to exercise reasonable prudence and not rely upon others with whom they deal to care for and protect their interests, this requirement is not to be carried so far that the law shall ignore or protect positive, intentional fraud successfully practiced upon the simple minded or unwary. . . ." (p. 283.)

A similar case on delay in discovering the fraud is *Dreiling v. Home State Life Ins. Co.*, 213 Kan. 137, 515 P. 2d 757.

It has been held that fraud vitiates whatever it touches including final judgments and final orders as well as contracts. (*Stegman v. Professional & Business Men's Life Ins. Co.*, 173 Kan. 744, 252 P. 2d 1074.)

Reviewing the record in this case as we must, there is substantial evidence from which it may be found Mr. Prather had a valid sublease with Derby. Mr. Prather's sublease had not been signed by any Derby official. Yet Mr. Prather gave valuable consideration for the sublease on the West 31st Street station, No. 9193, when he mutually agreed to terminate his South Broadway sublease. The security deposit of $500 was not then returned to Mr. Prather, but was carried as a security deposit under the new lease. Mr. Prather was given possession of the new premises at the West 31st Street station, No. 9193, and supplied products by Derby under the same terms and conditions as he had operated under the previous lease. For two and one-half months the terms of the lease, apparently satisfactory to Derby and with which Derby reasonably complied, were the basis upon which the station was operated by Mr. Prather. When the Derby officials told Mr. Prather he had no lease because no official had signed it, Derby fraudulently induced a false impression in the mind of Mr. Prather as to the legal nature of their transaction, both at the time the Derby officials took over the station and at the time Mr. Prather cashed the check for $626.11, 90 days later.

Under these circumstances the trial court erroneously sustained Derby's motion for summary judgment.

In announcing its decision the trial court did not state the legal principles controlling the decision. It was incumbent upon the trial judge to comply with K. S. A. 60-2702 (Rule No. 116, Rules

of the Supreme Court, 214 Kan. xxxvii) which has been held to apply to summary judgments in *Cherry v. Vanlahi, Inc.*, 216 Kan. 195, 531 P. 2d 66 and *Scott v. Day and Zimmerman, Inc.*, 216 Kan. 458, 532 P. 2d 1111.

Compliance with the rule may have alleviated some of our problems on appeal.

The judgment of the lower court is reversed.

MILLER, J., not participating.