**In re CHECKING ACCOUNT OVERDRAFT LITIGATION.**

**Case No. 1:09–MD–02036–JLK.**

United States District Court,
S.D. Florida.
Miami Division.

Signed June 8, 2015.

See, also, 307 F.R.D. 656, 2015 WL 3551555.

David M. Given, Phillips, Erlewine, Given & Carlin, LLP, San Francisco, CA, for Plaintiff.

Ashley Simonsen, Philip A. Scarborough, Cortlin H. Lannin, David M. Jolley, Sonya Diane Winner, Covington & Burling LLP, San Francisco, CA, Michael P. Beder, Emily Johnson Henn, Covington & Burling, LLP, Washington, DC, Barbara J. Dawson, Robert Matthew Kort, Snell & Wilmer LLP, Phoenix, AZ, Barry Rodney Davidson, Jamie Zysk Isani, Hunton & Williams LLP, Miami, FL, Brian J. Meenaghan, Ronald E. Beard, Rudy Albert Englund, Tara N. Gillespie, Lane Powell PC, Seattle, WA, Elizabeth S. Pehrson, Covington & Burling LLP, Redwood Shores, CA, Eric C. Bosset, Covington & Burling, LLP, Wasington, DC, Jay Earl Smith, Smith Larsen & Wixom, Las Vegas, NV, Laurence J. Hutt, Arnold & Porter LLP, Los Angeles, CA, Tracy L. Ashmore, Holme Roberts & Owen LLP, Denver, CO, for Defendant.

## ORDER AND OPINION GRANTING CLASS CERTIFICATION

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court upon the Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law, (DE 3262) (the "Motion"). The Court has carefully considered the Motion, response, reply, supplemental memoranda, and the documents attached to them, as well as the parties' voluminous evidentiary submissions and the oral argument of counsel. For the reasons that follow, the Court grants the Motion.

## INTRODUCTION

These cases arise from Wells Fargo Bank, N.A.'s ("Wells Fargo" or the "Bank") alleged scheme to wrongfully extract overdraft fees from Plaintiffs and similarly situated Wells Fargo consumers across the country. Through the use of specially designed software, Wells Fargo allegedly collected millions of dollars in excessive overdraft fees as a result of this scheme, much of it from Wells Fargo's most vulnerable customers. Plaintiffs allege that Wells Fargo disseminated uniform misrepresentations and manipulated debit card transactions by, among other things, paying items even when accounts lacked sufficient funds and by employing a bookkeeping device to post debit-card transactions from highest-to-lowest dollar amount. Plaintiffs further allege that these account manipulations were applied in the same manner to all class members by Wells Fargo's standardized "Hogan" system, causing funds in customer accounts to be depleted more rapidly, resulting in more overdrafts and more overdraft fees. Plaintiffs also allege that, in many instances, overdraft fees were imposed at times when, but for Wells Fargo's manipulations, there were sufficient funds in the consumers' accounts to cover the transaction. Plaintiffs have offered evidence to show that Wells Fargo did not disclose its manipulations to its customers, and took active steps to keep elements of this scheme secret. Wells Fargo disputes that it has committed any violations of law.

Plaintiffs now seek certification of their common law claims for breach of the contractual duty of good faith and fair dealing, unjust enrichment, and unconscionability, as well as statutory consumer protection claims

under the laws of New Mexico and Washington State.

## FACTUAL BACKGROUND *

Without making conclusive findings of fact at this pretrial stage, the following record evidence is material to the Court's rigorous analysis of the class certification requirements.

Wells Fargo is a national bank headquartered in San Francisco, California. In 2001, Wells Fargo changed its existing practice of posting debit transactions from lowest to highest dollar amount, and began posting them from highest to lowest dollar amount at the end of each business day. Ex. 4 ("Ex." refers to exhibits to the Motion). From 2001 until November 2010,[1] Wells Fargo systematically posted all debit transactions from high to low for checking accounts in all states except Nevada, where Wells Fargo adopted high-to-low posting in January 2006. Plaintiffs' have presented sufficient evidence to show that Wells Fargo adopted high-to-low posting to artificially increase the number of overdrafts so as to generate more overdraft fee revenue. *See, e.g.,* Exs. 2, 4. By doing so, Wells Fargo ensured that customers' balances would be depleted as quickly as possible, resulting in more overdraft charges than if the same transactions had been posted chronologically or in any order other than high to low. Exs. 2, 4, 9. Contemporaneous internal documents show, for instance, that Wells Fargo closely tracked the revenue "lift" from the re-sequencing and allied practices discussed below, and that its executives expressed concern when the "lift" was not as large as expected. *E.g.,* Exs. 14, 16 ("Real-time posting cannot support our current revenue objectives"). Plaintiffs' expert Arthur Olsen has opined, based on Wells Fargo's own computerized records, that each of the Plaintiffs was harmed by this high-to-low posting practice. Olsen Decl., ¶¶ 38–41, 45 (DE 3262–8).

After it began posting debit transactions from highest to lowest dollar amount, Wells Fargo implemented several closely allied initiatives that were also allegedly designed to drive up the Bank's revenue from overdraft fees. Wells Fargo referred to these initiatives as its Balance Sheet Engineering ( "BSE") project. Exs. 4, 15, 20. Wells Fargo estimated that the various "phases" of this scheme would increase its overdraft fee revenue by over $100 million annually. Exs. 14, 21.

First, beginning on December 1, 2001, and continuing through July 1, 2010, Wells Fargo "commingled" debit card transactions with checks and ACH transactions in a single posting group before re-sequencing the entire group of transactions from high to low. Exs. 4, 14, 22.[2] Before then, Wells Fargo had posted debit transactions in a separate group prior to posting checks and ACH transactions. Wells Fargo projected that this "commingling" would increase its overdraft fee revenue by tens of millions of dollars each year. Exs. 4, 9, 14. This projection was based on the mathematical certainty

---

* As discussed more fully below, in deciding class certification, the Court does not determine whether Plaintiffs allegations are true, or whether they will ultimately prevail on the merits. Rather, the Court considers the factual record to determine whether the requirements of Rule 23 are satisfied

1. On November 1, 2010, Wells Fargo discontinued its practice of re-sequencing debit transactions in high-to-low order in California, to comply with the injunction entered by the United States District Court for the Northern District of California. *Gutierrez v. Wells Fargo Bank, N.A.,* 730 F.Supp.2d 1080 (N.D.Cal.2010), *aff'd & rev'd in part,* 704 F.3d 712 (9th Cir.2012), *reinstated in part,* 944 F.Supp.2d 819 (N.D.Cal.2013), *aff'd & rev'd in part,* 589 Fed.Appx. 824 (9th Cir.2014), *cert. petition pending,* S.Ct. No. 14–1230. In May 2011, Wells Fargo adopted the same chronological posting order it had been using in California

for all other states. Exs. 4, 5. For further details on Wells Fargo's re-sequencing and allied practices, summarized herein, see the Findings of Facts rendered by the California District Court, at 730 F.Supp.2d at 1083–1120.

2. Wells Fargo's "commingling" practice applied nationwide except for in Nevada, where Wells Fargo posted checks separately and in serial order pursuant to a state law (Exs. 11, 12), and in Washington State and New Mexico. In a pilot program in the latter states, the Bank divided transactions into two batches—those executed on a prior day, and those executed on the business day of posting—and posted the first batch's transactions first (commingled, and high to low) and the second batch's second (commingled, and high to low). Exs. 4, 5, 10, 24.

that the more transactions are grouped together for high-to-low re-sequencing, the greater will be the effect of that re-sequencing. Ex. 2 ("Certainly the changes would result in increased overdrafts").

Second, Wells Fargo implemented what it referred to internally as a "shadow line" of credit. Exs. 4, 14. Prior to 2002, Wells Fargo declined debit card purchases and ATM withdrawals where the checking account lacked sufficient funds to cover the transaction at the time it was attempted. In 2002, however, Wells Fargo began approving such transactions up to a secret credit limit that it determined for each customer through computer algorithms. Exs. 2, 4, 10, 25. Wells Fargo adopted this "shadow line" of credit for debit card transactions in May 2002 and for ATM withdrawals in September 2002, and utilized it for both debit card transactions and ATM withdrawals in all states until July 2010. Ex. 23. As the phrase "shadow line" intimates, Wells Fargo neither disclosed to customers the existence of this line of credit nor the specific amount of credit for which the Bank had authorized their accounts to go into the negative. Ex. 2. At the point of sale or at an ATM machine, Wells Fargo customers were not informed that a given transaction would be approved into overdraft via the "shadow line," nor provided an opportunity to cancel the transaction. Exs. 2, 5. The "shadow line" was meant to drive up the Bank's overdraft fee revenue by a projected tens of millions of dollars each year. Exs. 2, 4, 9, 14.

Third, Wells Fargo not only failed to disclose its re-sequencing and allied practices to customers, it disseminated affirmative misrepresentations about its debit posting practices. For example, Wells Fargo's "Checking, Savings & More" marketing brochure represented to customers that debit purchases were "automatic" and debit cards would function just like cash. Ex. 37. Likewise, the "Welcome Jacket" that Wells Fargo regularly provided customers upon account opening stated: "Simply present the card to the merchant or swipe it through the keypad.... Each purchase is automatically deducted from your primary checking account." Ex. 38. Other Wells Fargo marketing materials similarly informed customers that money would come out of their checking account "automatically" or "immediately" when they made a debit card purchase. *E.g.,* Exs. 39–47. In fact, sums were not deducted "automatically" or "immediately"—instead, as discussed above, the Bank held the transactions and posted them in the middle of the night, in a, high-to-low order. Further, although Wells Fargo was regularly paying debit transactions even when a checking account lacked sufficient funds to cover them, its website promised customers that by using a debit card, "you can't spend more than you have." Ex. 45. As for Wells Fargo's form account agreement, it underwent only minor changes throughout the class period: each iteration disclosed (a) that the Bank "may" post debit transactions from high to low and (b) that the Bank retained discretion to post transactions however it wished, and without any notice to the customer. Exs. 28, 31. In addition, the account statements that Wells Fargo sent to its checking account customers listed transactions separately by type, notwithstanding the Bank's practice of "commingling" check, ACH, and debit card transactions and posting them from high to low in a single batch. Taken together, Wells Fargo's disclosures plausibly had the effect of obfuscating the reordering and allied practices that comprised the Bank's alleged scheme.

## CLASS CERTIFICATION STANDARDS

■ The Court must undertake a rigorous analysis into whether the Rule 23 prerequisites are met. *Klay v. Humana, Inc.,* 382 F.3d 1241, 1251 (11th Cir.2004). In making the decision, the Court does not determine whether Plaintiffs will ultimately prevail on the merits, but it considers the factual record in determining whether the requirements of Rule 23 are satisfied. *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1188 n. 15 (11th Cir.2003). As the Supreme Court recently stated, "the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* —— U.S.

——, 133 S.Ct. 1184, 1191, 185 L.Ed.2d 308 (2013).

■ Courts "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 298 (1st Cir.2000). In other words, the Court undertakes "an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or are susceptible of common proof equally applicable to all class members." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D.Mich. 2001) (quoting *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 241 (E.D.Mich.1997)).

Rule 23(a) states that a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). If the Court finds that the criteria of Rule 23(a) are satisfied, it then must also find that the class fits within one of the three categories in Rule 23(b) in order to certify.

## DISCUSSION

### I. The Class Definition

■ Before considering the express Rule 23 requirements, the Court considers whether a class exists that can adequately be defined. *Singer v. AT & T Corp.*, 185 F.R.D. 681, 685 (S.D.Fla.1998) (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir.1970)). "While the definition of the class must not be vague or difficult to apply, the implicit definition requirement does not require an overly

strict degree of certainty and is to be liberally applied." *Singer*, 185 F.R.D. at 685. Plaintiffs' proposed class consists of:

> All Wells Fargo customers in the United States, excluding the States of California and Indiana,[3] who had or have one or more consumer accounts and who, from applicable statutes of limitation through August 13, 2010 (the "Class Period"), incurred one or more overdraft fees as a result of Wells Fargo's practice of sequencing debit card transactions from highest to lowest, except for such overdraft fees incurred by former Wachovia customers pursuant to Wells Fargo carrying out the practices and policies of Wachovia.

> Excluded from the Class are Wells Fargo; its parents, subsidiaries, affiliates, officers, and directors; any entity in which Wells Fargo has a controlling interest; all customers who make a timely election to be excluded; and all judges assigned to this litigation and their immediate family members.

Plaintiffs also seek the certification of subclasses for specific claims as set forth in their Proposed Trial Plan for Trial of Class Claims (the "Trial Plan"). These subclasses are discussed toward the end of this Order.

■ The Court concludes first that the proposed class definition satisfies the requirements of Rule 23 in that certification does not require a merits determination. The ascertainability or definiteness inquiry, which "ensures that a proposed class will actually function as a class," *Byrd v. Aaron's Inc.*, 784 F.3d 154, 162 (3d Cir.2015), *as amended* (Apr. 28, 2015), is satisfied here because the class members can be identified from Wells Fargo's own records. *Id.* (ascertainability does not require "that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members can be identified.'") (citation omitted). Plaintiffs propose

---

**3.** The Court's exclusion of Indiana customers follows the suggestion of Plaintiffs at the class certification hearing, in response to Wells Fargo's argument that Indiana was not included within any of their proposed subclasses. This omission, in turn, resulted from the absence of an Indiana Plaintiff and the fact that Indiana law is not materially identical to the laws of the other states with respect to the claims grouped in the various subclasses. Missouri and Kansas are not included in any proposed subclass either; however, Wells Fargo did not do business in those states as of 2008, as the Bank represented to the Securities and Exchange Commission in a February 2008 disclosure.

**638**

to have their expert, Arthur Olsen, mine Wells Fargo's data to determine who the members of the class are, just as he has done numerous times before in this MDL as well as in the California Wells Fargo case. This method of determining class membership has been accepted by other courts, and on a number of occasions by this Court. *See Sadler v. Midland Credit Mgmt.*, 2009 WL 901479, at \*1–2, 2009 U.S. Dist. LEXIS 26771, at \*4–5 (N.D.Ill. Mar. 31, 2009) (automated query of defendants' database would yield "objective criteria" necessary to ascertain the class); *Stern v. AT & T Mobility Corp.*, 2008 WL 4382796, at \*5, 2008 U.S. Dist. LEXIS 110305, at \*12–13 (C.D.Cal. Aug. 22, 2008) (defendants' business records provided sufficient information to identify individuals who purchased cellular telephone service and were enrolled in either one of the challenged services without ever having requested the service); *In re Diet Drugs Prods. Liab. Litig.*, 1999 WL 673066, at \*12–13, 1999 U.S. Dist. LEXIS 13228, at \*34–35 (E.D.Pa. Aug. 26, 1999) (finding class definition adequate because there were reliable means to determine who had actually taken the drug where fact sheets, prescription records, and records of medical treatment were available to verify consumption); *see also Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir.1978), *aff'd sub nom. Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980); *see also In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 650–51 (S.D.Fla.2012) (*"Comerica "*); *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 680 (S.D.Fla.2011) (*"Union Bank "*), *pet. for leave to appeal denied*, No. 11–90012 (11th Cir. Oct. 7, 2011).

The Court further concludes that Plaintiffs have adequately identified a baseline posting order for comparison purposes. Plaintiffs allege that all customers who were charged additional overdraft fees, as compared to what they would have been charged under a low-to-high posting practice, were harmed by Wells Fargo's high-to-low re-or-

dering scheme. *See* Reply in Support of Class Certification, DE 3361 at 6–9. Wells Fargo utilized low-to-high posting for debits before it switched to high-to-low posting (Ex. 4 at 24–26), and a trier of fact could reasonably find that this is the proper baseline as it minimizes the occurrence of overdraft charges for the benefit of consumers. Thus, the members of the class are those persons who incurred one or more additional overdraft fees from the high-to-low posting order than they would have incurred had the Bank maintained its preexisting low-to-high posting order. Comparing the results of high-to-low sequencing (which yields the greatest number of overdraft fees) to low-to-high sequencing (which yields the lowest number of overdraft fees) defines the outer parameters of the class, generating the largest group affected by the high-to-low practice within the meaning of the class definition. Plaintiffs' expert, Mr. Olsen, can determine who these class members are by using the Bank's own data. The Court finds that this class definition is precise, objective, and properly tailored to the underlying conduct at issue.

The composition of the class, and those persons bound by the judgment, will not vary if the trier of fact ultimately decides that a less consumer-friendly posting order than low-to-high is appropriate, or even that a high-to-low posting order is consistent with the Bank's contractual and other obligations. 7A Wright, Miller & Kane, *Federal Practice & Procedure: Civil 3d* § 1760 (3d ed. 2005) ("If the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist."). This subsequent determination of the good-faith posting order will affect, if anything, the amount of damages only. *Klay*, 382 F.3d at 1259–60 ("[W]here damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification.") (footnotes omitted).[4] Plaintiffs have shown that

---

4. This principle remains true after *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). "The presence of individualized damages issues would not change this

result [i.e., certification]. Class-wide proof is not required for all issues." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir.2014); *see also Butler v. Sears, Roebuck and Co.*, 727 F.3d

for each permutation, the resulting damages can be calculated by Mr. Olsen.

■ The Court also concludes that the class definition is not impermissibly vague, notwithstanding that its start date is tied to the applicable statutes of limitation instead of to a specific date. Courts commonly certify classes with start dates linked to the statute of limitations where, as here, the challenged conduct predates the relevant limitations periods. *See, e.g., Vega v. T–Mobile USA, Inc.,* 564 F.3d 1256, 1263 (11th Cir.2009) (court did not take issue with definition of class period as beginning with the "commencement of the statute of limitations through the date that the Court certifies this suit as a class action"); *Comerica,* 286 F.R.D. at 650–51; *Union Bank,* 275 F.R.D. at 680–81; *Nelson v. Mead Johnson Nutrition Co.,* 270 F.R.D. 689 (S.D.Fla.2010) (certifying class defined as "[a]ll Florida consumers who purchased Enfamil® LIPIL® within the applicable statute of limitations."); *North Jackson Pharm., Inc. v. Express Scripts, Inc.,* 2006 WL 6625864, at *5–6, 2006 U.S. Dist. LEXIS 98774, at *18–20 (N.D.Ala. Mar. 3, 2006) (class certified where class period beginning date was based on when limitation period began to run).

Thus, because class membership is reasonably defined through objective criteria, the Court finds that the class is ascertainable.

## II. Rule 23(a)

### A. Numerosity

■ The first requirement of Rule 23(a) is that the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "[A] numerical yardstick is not the determinant for class certification; rather a court should examine the numbers involved to see if joinder of all is impossible or impracticable." *Hastings–Murtagh v. Texas Air Corp.,* 119 F.R.D. 450, 459 (S.D.Fla.1988). Parties seeking class certification need not know the "precise number of class members," but they "must make reasonable estimates with support as to the size of the proposed class." *Fuller v. Becker &*

*Poliakoff, P.A.,* 197 F.R.D. 697, 699 (M.D.Fla.2000). The Eleventh Circuit has held that "[g]enerally, less than twenty-one is inadequate, more than forty adequate." *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, 490 (S.D.Fla.2003) (quoting *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir. 1986)).

■ Although the exact number of class members here is not presently known, it appears to run in the millions, making joinder of them all impracticable if not impossible. Wells Fargo does not seriously contest numerosity except to argue that the arbitration clause in its form contract defeats numerosity by requiring the absent class members to submit to arbitration, leaving only the named Plaintiffs in these cases. But the arbitration clause in Wells Fargo's account agreement is permissive, not mandatory. *See Garcia v. Wachovia Corp.,* 699 F.3d 1273, 1275 (11th Cir.2012). As such, the absent class members are not bound to arbitrate all claims arising under this agreement. Wells Fargo relies on *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718 (11th Cir.1987), but the arbitration agreements in that case, by contrast, *"requir[ed]* the arbitration of 10b–5 claims" under the Securities Exchange Act. *Id.* at 725 n. 5 (emphasis added). Here, each party instead has the right to request arbitration should they choose to do so. Permissive arbitration clauses are not self-executing. *Garcia,* 699 F.3d at 1275; *also Gutierrez v. Wells Fargo Bank, NA,* 704 F.3d 712, 718 (9th Cir.2012) (noting arbitration clause was permissive).

The absent class members, however, are not before this Court until the point of certification. As the Eleventh Circuit held in the most recent appeal of these cases, "Certification of a class is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power." *In re Checking Account Overdraft Litig.,* 780 F.3d 1031, 1037 (11th Cir.2015). Therefore, Wells Fargo's arbitration-based argument is premature given the permissive nature of

796, 801–02 (7th Cir.2013). Indeed, "nothing" in *Comcast* even "mandates a formula for class-wide measurement of damages in all cases," *In*

*re Deepwater Horizon,* 739 F.3d 790, 815 (5th Cir.2014), although Plaintiffs have put forth a workable formula here.

these agreements and the stage of this litigation.

Accordingly, the Court finds that the numerosity requirement of Rule 23 is satisfied.

## B. Commonality and Typicality [5]

■ Rule 23(a)'s commonality prerequisite requires that there be at least one issue common to all members of the class. The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted." *Rolland v. Patrick*, No. 98–30208, 2008 WL 4104488, at *4, 2008 U.S. Dist. LEXIS 66477, at *12 (D.Mass. Aug. 19, 2008) (citations omitted); *see also Cheney*, 213 F.R.D. at 490 (commonality threshold is "not high"). It only requires "at least one issue common to all class members." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 604 (S.D.Fla.2003) ("Plaintiffs' legal claims need not be completely identical and factual differences concerning treatment or damages will not defeat a finding of commonality.") The commonality element is generally satisfied when a plaintiff alleges that "[d]efendants have engaged in a standardized course of conduct that affects all class members." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 687 (S.D.Fla.2004); *In re Recoton Corp. Secs. Litig.*, 248 F.R.D. 606, 616, 618 (M.D.Fla. 2006).

Relying on *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), Wells Fargo contends that Plaintiffs have not satisfied the commonality requirement. In *Dukes*, the Supreme Court decertified a Rule 23(b)(2) class consisting of 1.5 million current and former employees of Wal–Mart. The Court held that the plaintiffs failed to satisfy the commonality requirement because they "provide[d] no convincing proof of a companywide discriminatory pay and promotion policy," *id.* at 2557, and without such proof, it would have

been impossible to arrive at a common answer to the question of why each class member was disfavored, which was the "crux of the inquiry" for the plaintiffs' Title VII claims in that case. *Id.* at 2552.

Unlike the plaintiffs in *Dukes*, these Plaintiffs have submitted evidence of a common corporate policy or practice, namely, Wells Fargo's systematic, computerized, and uniform manipulation and re-ordering of debit card transactions, its development and implementation of the allied "commingling" and "shadow line" practices, and its misrepresentations of its overdraft practices, all to increase the number of overdraft fees imposed. Plaintiffs provided substantial evidence of Wells Fargo's uniform overdraft scheme, thereby satisfying both the commonality and typicality standards. "Of course, when a group of plaintiffs suffer under a uniform policy, the commonality test is often satisfied, even after *Dukes*." *Oakley v. Verizon Commc'ns, Inc.*, No. 09–9175, 2012 WL 335657, at *14, 2012 U.S. Dist. LEXIS 12975, at *38 (S.D.N.Y. Feb. 1, 2012). The Court finds that common questions of fact and law apply to all class members and will drive the resolution of this litigation. *Dukes*, 131 S.Ct. at 2551. Such questions include whether Wells Fargo:

- Manipulated and re-ordered transactions in order to increase the number of overdraft fees imposed;
- Concealed from class members the limits of their overdraft "shadow" credit line, the existence of such a limit, and the fact that the Bank would pay transactions into overdraft instead of declining to authorize them;
- Concealed from class members the fact that checks, ACH transactions, and debit card transactions would be "commingled" together in a single batch upon account posting;

---

5. The typicality and commonality requirements are distinct but interrelated, as the Supreme Court noted: " 'The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.' " *Cooper v. Southern Co.*, 390 F.3d 695, 713 (11th Cir.2004) (quoting *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006)).

- Concealed from class members the purpose and consequences of its reordering scheme: increasing overdraft fee occurrences and revenue;

- Decided not to alert class members that an ATM withdrawal or debit card transaction would trigger an overdraft fee if processed and not to provide them with an opportunity to cancel the transaction;

- Imposed overdraft fees when, but for the re-sequencing, checking accounts would have contained sufficient funds;

- Delayed posting transactions so that class members were charged overdraft fees even when the account contained sufficient funds to cover the transactions; and

- Purveyed uniform misrepresentations that a debit card functioned just like cash and that customers couldn't spend more than they had in their account.

■ The Court finds that, based on the evidence presented, Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent class members.[6] Pursuant to a standardized, automated process, Wells Fargo posted all debit transactions that settled on a given day late in the evening or early the following morning before business hours. The order in which the Bank posted debit transactions to an account directly corresponded to the order in which the funds were deducted from the account. Throughout the class period, as to each Plaintiff and class member, it was Wells Fargo's uniform practice to post all point-of-sale, ATM, and teller debit transactions together and in the order of highest-to-lowest dollar amount. All Plaintiffs and members of the class, whose accounts were governed by common and materially uniform agreements, were subjected to Wells Fargo's practice of re-sequencing debit card transactions from high-to-low, and Plaintiffs allege that they and all class members incurred additional overdraft fees as a result. When the trier of fact decides whether Wells Fargo's uniform high-to-low reordering, which applied to all of its customers in the same way, was improper, the trier of

fact will thereby "generate [a] common answer" that "will resolve an issue that is central to the validity of [Plaintiffs'] claims in one stroke." *Dukes*, 131 S.Ct. at 2551.

The alleged scheme, moreover, entailed more than just the high-to-low posting order. The "commingling" and "shadow line" practices, together with the uniform misrepresentations about how the Bank was processing debit card transactions, combined to cause more overdrafts and greater revenue for the Bank. These practices were integral to the scheme, and they involve common issues which implicate common proof. It has long been true that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action," and such is the case here. *See* Fed.R.Civ.P. 23(b)(3) advisory committee's note (1966).

■ Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). The typicality test centers on "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named class plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Although similar to commonality in that it concentrates on the "nexus" between class members and their designated representative, typicality differs from commonality in that it focuses on the class representative's individual characteristics in comparison to those of the proposed class. *Piazza v. EBSCO Indus. Co.*, 273 F.3d 1341, 1346 (11th Cir.2001); *Prado–Steiman v. Bush*, 221 F.3d 1266, 1269 (11th Cir.2000). Typicality is satisfied where the named plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985); *see also SCI Funeral Servs.*, 212

---

**6.** These facts are referenced in greater detail in the discussion of predominance below.

F.R.D. at 604–05; *Pottinger v. Miami*, 720 F.Supp. 955, 959 (S.D.Fla.1989).

 "The test for typicality, like commonality, is not demanding." *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 532 (M.D.Fla.1996). Neither typicality nor commonality requires that all putative class members share identical claims, and both may be satisfied even if some factual differences exist between the claims of the representative and represented parties. *Kornberg*, 741 F.2d at 1337; *Prado–Steiman*, 221 F.3d at 1279 n. 14.

> Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory. . . . Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories. Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.

*Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir.1994) (citations and alterations omitted); *see also Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985) (strong similarity is sufficient for typicality, even where factual differences exist). To defeat typicality, the factual variation presented by a class representative's claim "must be clear and must be such that interests of the class are placed in significant jeopardy." *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D.Fla.1996).

 The common issues arising from Wells Fargo's overdraft scheme are shared by Plaintiffs and the class, and there is no material factual variation that would place the interests of the class in jeopardy. Courts have regularly found that typicality is satisfied where a defendant has engaged in a common course of misrepresentation or concealment, even where class representatives were not subject to identical contracts. *See Salvagne v. Fairfield Ford, Inc.*, 264 F.R.D. 321, 328 (S.D.Ohio 2009); *Demmick v. Cellco P'ship*, No. 06–2163, 2010 WL 3636216, at *7–9, 2010 U.S. Dist. LEXIS 94041, at *19–25 (D.N.J. Sept. 8, 2010); *Fischler v. AmSouth Corp.*, 176 F.R.D. 583, 585–86 (M.D.Fla.1997).

 Wells Fargo claims that Plaintiffs have different expectations and preferences in posting order and cannot be typical of the class. Yet it is the defendant's common course of conduct that governs considerations of typicality, not the class representatives' subjective expectations or preferences. *See Johnson v. GEICO Cas. Co.*, 673 F.Supp.2d 255, 275–76 (D.Del.2009); *Marcus v. B.M.W. N. Am., LLC*, 2010 WL 4853308, at *5–6, 2010 U.S. Dist. LEXIS 122908, at *16–17 (D.N.J. Nov. 19, 2010). Plaintiffs and the members of the class are all challenging the same overdraft policies of Wells Fargo and seeking to recover the additional overdraft fees they incurred as a result of Wells Fargo's re-sequencing of their transactions. This is true irrespective of the cause of action alleged.

Wells Fargo contends that Plaintiffs' claim for breach of the contractual covenant of good faith and fair dealing requires an assessment of individual expectations. To the extent expectations are relevant, however, an objective standard governs; individual expectations are irrelevant. *See Union Bank*, 275 F.R.D. at 680 ("For example, it is not the case that the individual Plaintiffs' and class members' subjective expectations are necessary to prove their claims. To the contrary, breach of the covenant good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct"); *Comerica*, 286 F.R.D. at 657. The Restatement recognizes that "[s]uch a writing is interpreted wherever reasonable as treating alike all those similarly situated, *without regard to their knowledge or understanding of the standard terms of the writing*." RESTATEMENT (SECOND) OF CONTRACTS § 211(2) (1981) (emphasis added). Hence, that some customers might have superior knowledge is immaterial. "[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it. The result may be to give

the advantage of a restrictive reading to some sophisticated customers who contracted with knowledge of an ambiguity or dispute." *Id.* at cmt. e. This claim can be established by common proof of Wells Fargo's uniform application of high-to-low posting and related devices like the "shadow line" to the members of the class and the Bank's concealment of its overdraft practices that affected Plaintiffs and the class alike.

Differences in the degree of customer awareness do not establish atypicality here. Plaintiffs allege that Wells Fargo's concealment of its overdraft policies prevented both Plaintiffs and the class members from gaining sufficient knowledge to understand Wells Fargo's scheme and how it could affect them. Some customers' knowledge of Wells Fargo's high-to-low posting order alone, without awareness of Wells Fargo's "shadow line" and "commingling" systems (which Wells Fargo uniformly concealed from customers), does not bar class certification. The evidence regarding Wells Fargo's scheme, including its uniform misrepresentations and concealment of its overdraft practices, renders Plaintiffs' unjust enrichment and unconscionability claims typical of the class claims. *See Spencer v. Hartford Fin. Servs. Group, Inc.,* 256 F.R.D. 284, 291 (D.Conn.2009).

Wells Fargo also cites supposedly divergent customer preferences to argue that damage calculations will differ, and that the identity of the class members that have been damaged will vary, depending upon the alternative posting order selected. Class membership is discussed above, and will not vary on this basis. Further, as noted above, individual preferences are irrelevant. Differences in the amount of damages suffered by the class representatives and the class do not, of course, affect typicality. *Kornberg,* 741 F.2d at 1337.

Nor are the claims of the New Mexico and Washington Plaintiffs rendered atypical because Wells Fargo used a variant of high-to-low posting in those states. The so-called "TOD" initiative, which the Bank tested in New Mexico and Washington to find out if it could reap even more overdraft fee revenue (Exs. 75, 76, 78; Reply Ex. 74, 77), nonetheless relied on exactly the same high-to-low re-sequencing as everywhere else—just within two separate batches sorted based upon whether transactions were carried out on that day or on a previous day. This minor difference is insufficient to defeat typicality where this variant utilized the same basic debit re-sequencing practice and the Bank implemented the same allied practices of "commingling" and "shadow line" in the test States. Neither did the form account agreement in these states ever plainly disclose how Wells Fargo was actually sequencing charges when it posted them.

One of the New Mexico Plaintiffs, Marc Martinez, had his account closed with a negative balance, but this does not make him atypical of the class. Many other class members also had their accounts closed—in part because of the Bank's scheme that triggered a slew of fees. Moreover, to the extent it may be appropriate to offset damages based on such "charged off" amounts, those amounts can readily be applied as an offset or to reduce the amount the account holder may owe. *See, e.g., Spicer v. Chicago Bd. Options Exchange, Inc.,* 844 F.Supp. 1226, 1236 (N.D.Ill.1993); *Carbajal v. Capital One, F.S.B.,* 219 F.R.D. 437, 441 n. 2 (N.D.Ill.2004) ("[T]here is no reason to believe that [setoffs] would end up as a significant focus of the case; the setoff would likely involve nothing more than a mere calculation."). Defenses "(such as setoff) pertain (if at all, to a merits determination to be made later) to damages, and can be accounted for in Plaintiffs' expert's calculations." *Comerica,* 286 F.R.D. at 660; *In re Checking Account Overdraft Litig.,* 281 F.R.D. 667, 678 (S.D.Fla.2012) (*"TD Bank"*); *Union Bank,* 275 F.R.D. at 677.

Finally, Plaintiffs have proposed discrete multi-state subclasses for some of the state law claims, to ensure that the class representatives' claims are materially identical to those of all other class members they represent. The Court addresses below the application of these subclasses, which provide additional assurances of typicality. Based on the foregoing, the Court finds that the commonality and typicality requirements are met.

## C. Adequacy

■ The Court must also be satisfied that the "representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This requirement is met when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the actions. *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir.2003). Adequacy exists where the named plaintiffs share common interests with the class members and seek the same type of relief for themselves as for the class. *Pottinger*, 720 F.Supp. at 959.

■ The Court is satisfied that the named Plaintiffs will fairly and adequately represent the interests of the class and each relevant subclass. The central issues here—the existence, consequences, and propriety of Wells Fargo's alleged scheme to manipulate debit card transactions to increase the number of overdraft fees it could assess—are common to the claims of Plaintiffs and the other members of the class. Based on the evidence in the record regarding the named Plaintiffs, including their deposition testimony, they each have a strong interest in proving the alleged scheme, establishing its unlawfulness, demonstrating the impact of the conduct, and obtaining redress. Wells Fargo contested adequacy at the class certification hearing on the grounds that, because of the subclass arrangements, some Plaintiffs may end up pursuing only one of the common law claims against the Bank. However, Wells Fargo cites nothing suggesting a class representative needs to maintain any more than one cause of action in order to properly pursue or secure complete relief for the represented class or subclass. Accordingly, the Court finds that the named Plaintiffs "share the true interests of the class" and are adequate representatives. *Hastings–Murtagh*, 119 F.R.D. at 459; *see also Tefel v. Reno*, 972 F.Supp. 608, 617 (S.D.Fla.1997) (the "common goal of each member of the class" is to remedy the unlawful conduct, and "[i]f the Plaintiffs succeed, the benefits will inure to all class members.").

The Court is not persuaded that there exists an intra-class conflict over which alternative posting order should be used to calculate damages. To the extent individual preference with regard to posting order is relevant, there does not appear to be any competent evidence that class members would prefer a high-to-low posting order over any of the possible alternatives, such as chronological or low-to-high. *See Gutierrez*, 730 F.Supp.2d at 1105. And if Plaintiffs establish Wells Fargo's liability, the evidence indicates that most if not all class members stand to benefit, regardless of the alternative posting order ultimately chosen by the trier of fact, because the bulk of Wells Fargo's overdraft revenue came from a concentrated population of customers (the ones who lived from paycheck to paycheck). There is no evidence that any Plaintiff lacks incentive to vigorously prosecute these cases on behalf of the class and the relevant subclasses.

The Court further finds that Plaintiffs' counsel have no interests that are antagonistic to those of the absent class members and that they have diligently represented their clients and the absent class members. The law firms seeking to represent the class here include very qualified and experienced lawyers. The Court has thoroughly reviewed the firm resumes setting forth their experience and expertise in class actions, and notes that their work has been consistently excellent in this MDL. The Court is therefore satisfied that the Plaintiffs and the firms seeking appointment as class counsel will properly and adequately prosecute these cases.

The Court therefore appoints as class representatives Marc Martinez, a resident of New Mexico; Ivy Graham, a resident of New Mexico; Dolores Gutierrez, a resident of Oregon; Karen and Edward Wickman, residents of Oregon; Michael Dehn, a resident of Washington State; Alex Zankich, a resident of Washington State; and William Rucker, a resident of Washington State. In addition, the Court appoints the following firms as class counsel pursuant to Fed.R.Civ.P. 23(g): Podhurst Orseck, P.A.; Bruce S. Rogow, P.A.; Grossman Roth, P.A.; Lieff Cabraser Heimann & Bernstein LLP; Webb, Klase &

Lemond, LLC; Trief & Olk; Baron & Budd, P.C.; and Golomb & Honik, P.C.

## III. Rule 23(b)(3)

Plaintiffs bring these actions under Rule 23(b)(3), which requires (i) that questions of law or fact common to class members predominate over any questions affecting individual members, and (ii) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### A. Predominance

 "Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Klay,* 382 F.3d at 1255 (quoting *Ingram v. Coca–Cola Co.,* 200 F.R.D. 685, 699 (N.D.Ga. 2001)); *see also Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002) (common issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."). It is not necessary that all questions of law or fact be common; only some questions must be common, and they must predominate over individual questions. *See Klay,* 382 F.3d at 1254; *see also Allapattah Servs., Inc. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir.2003), *aff'd,* 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) ("the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.").

 The predominance inquiry focuses on the number and significance of common issues. It does not require a complete absence of individual issues. *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). "In order to 'predominate,' common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986). Efficiency is the over-

riding, textually-mandated concern. *Butler,* 727 F.3d at 800. Hence, if the liability issue is shared among the class members, common questions ordinarily will predominate over individual questions. *Singer,* 185 F.R.D. at 690; *see also SCI Funeral Servs.,* 212 F.R.D. at 606 ("In deciding whether common questions predominate under Rule 23(b)(3), courts generally focus on whether there are common liability issues which may be resolved efficiently on a class-wide basis.") (citation omitted); *Cooper v. Pacific Life Ins. Co.,* 229 F.R.D. 245, 263–64 (S.D.Ga.2005) (finding predominance satisfied despite "fact that some individual consideration of customers' unique circumstances would have been necessary" to evaluate their claims, where "class-wide liability exists, if at all, because of the . . . common course of conduct, through misleading omissions . . . and otherwise").

 Here, "irrespective of the individual issues which may arise, the focus of the litigation" will be "the alleged common course" of unfair conduct embodied in Wells Fargo's alleged scheme to maximize overdraft fees through the reordering of transactions at account posting. *Sargent v. Genesco, Inc.,* 75 F.R.D. 79, 86 (M.D.Fla.1977). Any analysis of this scheme will depend on evidence relating to the standardized account agreement and overdraft practices affecting all class members in a uniform manner. Predominance is "a test readily met in certain cases alleging consumer . . . fraud," *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), particularly where, as here, uniform practices and misrepresentations give rise to the controversy. *See, e.g., In re U.S. Foodserv. Pricing Litig.,* 729 F.3d 108, 120 (2d Cir. 2013) (holding that class actions may be reasonably litigated through use of "legitimate inferences based on the nature of the alleged misrepresentations at issue") (quoting *Klay,* 382 F.3d at 1259); *Powers v. Hamilton County Public Defender Comm'n,* 501 F.3d 592, 619 (6th Cir.2007) ("Cases alleging a single course of wrongful conduct are particularly well-suited to class certification.").

Plaintiffs allege that Wells Fargo's course of conduct commonly, and adversely, affected the entire class, and submitted extensive evi-

dence to support that allegation. The class members are similarly situated with regard to the readily determined, allegedly excessive number of fees they incurred as a result of this standardized process. The class is unified by both common questions and a common interest. The evidence necessary to establish Plaintiffs' claims is common to the named Plaintiffs and all class members; all seek to prove that Wells Fargo's high-to-low re-sequencing practice was wrongful. That evidentiary presentation involves the same evidence of (i) Wells Fargo's form contracts, with similar terms, applicable to all Plaintiffs and class members; (ii) Wells Fargo's systematic re-sequencing of debit transactions from high-to-low for all Plaintiffs and class members through its automated software programs; (iii) the overdraft limits that Wells Fargo secretly established for all Plaintiffs and class members in order to maximize fees and minimize risk to the Bank; (iv) the "commingling" practice by which Wells Fargo batched together debit transactions with checks and ACH transactions to further increase overdraft fee revenue; and (v) Wells Fargo's uniform misrepresentations to its customers that a debit card worked like cash, such that the money would come out of their account right away and they could not spend more than they had.

Wells Fargo points out two primary variations in the applicable account agreements, including language describing its high-to-low posting practice. These differences do not alter the analysis. Both the pre- and post-October 2004 versions of the account agreement purported to confer total discretion in Wells Fargo; neither fully discloses the facts of the Bank's high-to-low posting practice or its practice of paying charges into overdraft without customer consent. The variations in the disclosures do not defeat predominance. Whether the disclosures in its account agreements sufficed to adequately inform the class members of Wells Fargo's practices is a question common to all class members, and one which predominates over the individual issues. *Cf. Gutierrez*, 730 F.Supp.2d at 1116

(merely informing customers that the bank posts high-to-low does not fairly disclose *how* that practice could affect the number of individual overdrafts).

■ Unique defenses rarely predominate where a common course of conduct is shown. *Wahl v. Midland Credit Mgmt.*, 243 F.R.D. 291, 297–98 (N.D.Ill.2007); *Demmick v. Cellco P'ship*, 2010 WL 3636216, *7–8, 2010 U.S. Dist. LEXIS 94041, *20–21 (D.N.J. Sept. 8, 2010). It has not been shown that unique defenses are likely to become the focus of this litigation. Wells Fargo's defenses against Plaintiffs are related to the class claims and are typical of those that Wells Fargo will assert against the class.

As discussed below, Plaintiffs have met their burden of showing that common issues of fact and law will predominate within the subclasses they have proposed for each of their claims. As this Court observed in *Union Bank*, the Court may certify multi-state classes even if "different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court … can manage by means of" sub-classing. 275 F.R.D. at 679–80 (quoting American Law Institute, *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010)); *also Comerica*, 286 F.R.D. at 656; *TD Bank*, 281 F.R.D. at 680–81.

### (i) Breach of the Contractual Covenant of Good Faith and Fair Dealing

■ The Court finds that Plaintiffs have appropriately and timely alleged breach of the contractual covenant of good faith and fair dealing. Further, the Court is not persuaded by Wells Fargo's objection that individual class members' subjective preferences for posting order and expectations concerning overdraft fees will undermine the common issues that give rise to this claim. The reasonable expectations of a party to a form contract are judged objectively, from the perspective of a reasonable person, making the subjective views of class members irrelevant.[7] Common issues clear-

7. *See, e.g., Parcel Tankers, Inc. v. M/T Stolt Luisa Pando*, 787 F.Supp. 614, 618 (E.D.La.1992); *In re Chase Bank USA, N.A. "Check Loan" Contract Litig.*, 274 F.R.D. 286, 290 (N.D.Cal.2011) ("the reasonable expectations of the class [asserting a good faith and fair dealings claim under Dela-

ly predominate as to whether Wells Fargo's high-to-low debit reordering scheme and its allied practices, including the Bank's misleading disclosures, manifest bad faith and violated customer expectations.

### (ii) Unjust Enrichment

█ Unjust enrichment claims can be certified for class treatment where common circumstances bear upon whether the defendant's retention of a benefit from class members was unjust. *See James D. Hinson Elec. Contr. Co. v. Bellsouth Telecomms., Inc.,* 275 F.R.D. 638, 647 (M.D.Fla.2011).[8] That situation exists here. Based on the evidence presented, class-wide evidence may be able to ultimately prove that Wells Fargo deceived its customers through uniform misrepresentations and concealment of important information about its overdraft policy, including the high-to-low reordering, the existence and the amount of customers' secret overdraft limits, and the impact of "commingling" and its allied practices in increasing the incidence of overdrafts. These factors go directly to the alleged wrongfulness of Wells Fargo's retention of the excess overdraft fees it allegedly collected as a result of the money-making scheme.

█ There is general agreement among courts that the "minor variations in the elements of unjust enrichment under the laws of the various states … are not material and do not create an actual conflict." *Pennsylvania Emp., Benefit Trust Fund v. Zeneca, Inc.,* 710 F.Supp.2d 458, 477 (D.Del.2010). A leading case is *In re Mercedes–Benz Tele Aid Contract Litig.,* 257 F.R.D. 46 (D.N.J.2009) (certifying nationwide class), *and* 267 F.R.D. 113 (D.N.J.2010) (*"Mercedes II"*) (denying decertification motion), *Rule 23(f) pet. denied,* 2010 U.S.App. LEXIS 8087 (3d Cir. Apr. 19, 2010). In *Mercedes,* the district court undertook a searching analysis of the comparative law of unjust enrichment in the context of class certification, and concluded that "[w]hile there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict." *Id.* at 58. The court reaffirmed this analysis in *Mercedes II,* 267 F.R.D. at 119–23. This reasoning is persuasive, and courts in this District have reached similar results. In *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 697 & n. 40 (S.D.Fla.2004), the court certified a multistate unjust enrichment class, finding that "[t]he standards for evaluating each of the various states classes' unjust enrichment claims are virtually identical" and that minor variation in states' laws "present[ed] no obstacle to class certification." *See also Singer,* 185 F.R.D. at 692 (concluding that the elements of unjust enrichment are "materially the same throughout the United States."). Courts elsewhere are in accord. *See, e.g., In re Abbott Laboratories Norvir Anti–Trust Litig.,* 2007 WL 1689899, at *9–10 (N.D.Cal. 2007) (certifying nationwide unjust enrichment class, finding that "the variations among some states' unjust enrichment laws do not significantly alter the central issue or the manner of proof"). Application of the unjust enrichment doctrine has a "universal thread," *Schumacher v. Tyson Fresh Meats, Inc.,* 221 F.R.D. 605, 612 (D.S.D.2004), and the claim is well-suited for multi-state class treatment by virtue of its uniform availability and focus on the defendant's ill-gotten gain.

Based on the record presently before the Court, *Vega v. T–Mobile USA, Inc.,* 564 F.3d 1256 (11th Cir.2009), does not counsel against class treatment of these unjust enrichment claims. In *Vega,* different employee-plaintiffs had markedly different levels of knowledge and understanding of the commission systems established by the defendant's employment contracts based on information they may or may not have received from the

---

ware law] are measured by an objective standard"); *Clancy v. King,* 405 Md. 541, 954 A.2d 1092, 1108 (2008) (under Maryland law, objective standard applies); *see also Union Bank* ("breach of the duty good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct").

**8.** *See also County of Monroe v. Priceline.com, Inc.,* 265 F.R.D. 659, 671 (S.D.Fla.2010); *Cassese v. Wash. Mut., Inc.,* 255 F.R.D. 89, 97–98 (E.D.N.Y.2008).

defendant. *Id.* at 1274–75. Here, however, there is no evidence that any class members learned the true nature and impact of Wells Fargo's alleged scheme. Mere awareness of the high-to-low posting is only part of the equation. Unlike in *Vega*, for example, there is evidence substantially supporting Plaintiffs' allegation at this stage that Wells Fargo's practices were concealed from its customers. Thus, these cases are like others in which certification of unjust enrichment claims is proper.

### (iii) Unconscionability Claims

■ The Court finds that common issues also predominate as to the unconscionability claims. Because unconscionability is judged "at the time the contract was made," [9] the Court holds that disclosures made after customers' accounts were opened do not control the analysis. The account agreements are materially identical, and the trier of fact could conclude, based on subclass-wide proof, that Wells Fargo's affirmative misrepresentations and failures to disclose the operative features of its overdraft policies were sufficiently unfair and deceptive as to be unconscionable. *See Davis v. Cash For Payday, Inc.*, 193 F.R.D. 518, 522–23 (N.D.Ill.2000) (certifying unconscionability class claim because common issues predominate); *In re United Cos. Fin. Corp.*, 276 B.R. 368, 375–76 (D.Del.2002) (collecting cases).

■ Common issues also predominate for procedural unconscionability, which looks to such considerations as the disparity in bargaining power between the parties, *e.g.*, *Kinkel v. Cingular Wireless LLC*, 223 Ill.2d 1, 306 Ill.Dec. 157, 857 N.E.2d 250, 264 (2006), whether the contract was presented on a take-it-or-leave-it basis, *id.*, 306 Ill.Dec. 157, 857 N.E.2d at 265, and whether important terms are hidden in a maze of fine print, *e.g.*, *Glassford v. BrickKicker*, 191 Vt. 1, 35 A.3d 1044, ¶¶ 28–30 (2011); *see also* DE 514 at 5–6. Particularly because Wells Fargo's customers were similarly situated vis-à-vis the Bank, any individualized issues having to do with differences in customers' backgrounds do not swamp the common issues

arising from the features of Wells Fargo's account agreement and its formation. Whether or not Plaintiffs' claims of unconscionability succeed, they will be decided by reference to common proof at trial.

\* \* \* \* \* \*

Wells Fargo's corporate policies "constitute the very heart" of the claims for which Plaintiffs seek class certification. As a result, common issues will predominate because those policies "would necessarily have to be re-proven by every plaintiff." *Klay*, 382 F.3d at 1257; *see also Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir.2003), *aff'd*, 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005). In opposition, Wells Fargo relies on two Eleventh Circuit cases, *Klay* and *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159 (11th Cir.2010). Nonetheless, the problems that plagued those cases are simply not present here.

In *Klay*, the court ultimately found certification of the breach of contract claims inappropriate given the individualized issues of fact they entailed, even though questions of contract law were common to the whole class. *Id.* at 1261. There were many different defendants with many different contracts with many different provider groups. Moreover, because the defendants breached the contracts through a variety of means and differing computer algorithms that were not subject to generalized proof, each physician would have to prove a variety of individual circumstances leading to the breach. *Id.* at 1263–64.

Similar problems precluded certification in *Sacred Heart*, where there were substantial variations in the terms of over 300 hospital contracts that were individually negotiated, leading the court to find that "the diversity of the material terms is overwhelming." *Sacred Heart*, 601 F.3d at 1171–72. In contrast, the account agreements at issue here are uniform form contracts offered on a take-it-or-leave it basis that were not the product of any individual negotiation. *Id.* at 1171 ("It

---

**9.** *See Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 408 N.E.2d 1370, 1375 (1980); E. ALLAN FARNSWORTH, CONTRACTS, § 4.28 n. 53 (2d ed. 1990)

("UCC 2–302 does make it clear that any unfairness in the terms is to be judged at the time the contract is made and not at some later time").

is the form contract, executed under like conditions by all class members, that best facilitates class treatment."). Nor need Plaintiffs prove a variety of individual circumstances supporting the breach, as Wells Fargo's standard re-sequencing policy resulted in uniform conduct directed at all members of the class.

Judge Alsup's certification in the California class action, *Gutierrez v. Wells Fargo Bank, N.A.*, is instructive. As here, Wells Fargo insisted that individual issues predominated. Judge Alsup, however, disagreed because the "challenged practice is a standardized one applied on a routine basis to all customers." 2008 WL 4279550, at *17, 2008 U.S. Dist. LEXIS 70124, at *48 (N.D.Cal. Sept. 11, 2008). Thus, while "there will be some individual issues ... these individual variations will not predominate over the pervasive commonality of the highest-to-lowest method and its adverse impact on hundreds of thousands of depositors." *Id.* These circumstances make for a quintessential class action. Here, as in *Gutierrez,* Plaintiffs allege that Wells Fargo re-sequenced debit card transactions posted to their checking accounts from highest to lowest in order to maximize overdraft penalties against customers. Moreover, as in *Gutierrez,* Wells Fargo's "challenged practice is a standardized one applied on a routine basis to all customers." *Id.* at *17, 2008 U.S. Dist. LEXIS 70124 at *48. Any individual issues will "not predominate over the pervasive commonality of the highest-to-lowest posting method and its adverse impact on hundreds of thousands of depositors." *Id.* *Gutierrez* was successfully tried to a verdict, and the Court of Appeals affirmed Judge Alsup's recognition of the propriety of class treatment. 704 F.3d at 729 ("[W]e are hard pressed to agree that any class member would prefer to incur multiple overdraft fees.").

### B. Superiority

■ A class action constitutes the only realistic way Plaintiffs' claims can be adjudicated. "Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy v. Tallant,* 710 F.2d 711, 718 (11th Cir.1983). The class action fills an essential role when the plaintiffs would not have the incentive or resources to prosecute relatively small claims in individual suits, leaving the defendant free from legal accountability. The Supreme Court has long recognized that where, as here, "it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." *Deposit Guar. Nat'l Bank of Jackson, Miss. v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980); *see also, e.g., Phillips Petro. Co. v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (noting that the class action mechanism may empower "plaintiffs to pool claims which would be uneconomical to litigate individually," such as when most of them "would have no realistic day in court if a class action were not available."); *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1154 (11th Cir.1983) ("[T]he class attorney, who is familiar with the facts and the progress of the litigation, will be able to present the claimant's case. If relegated to a new suit, the individual might be unable to obtain counsel to prosecute his action when the amount of individual damages is relatively small.... By obviating the need to bring a new lawsuit, the expense of litigating the new individual claim is reduced.") (quoting *Pettway v. Am. Cast Iron Pipe Co.,* 576 F.2d 1157, 1220 n. 80 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979)).

■ Class treatment is superior to other available methods for the fair and efficient adjudication of this controversy. Nearly all of the class members in these actions have claims that are so small that it would cost them much more to litigate individually than they could ever hope to recover in damages, and thus there is no reason to believe that the putative class members have any particular interest in controlling their own litigation. Wells Fargo suggests some class members may have preferred an alternative posting order, but the legal and expert costs alone needed to litigate the case and calculate the damages would far exceed any individual class member's recovery, and Wells Fargo does not demonstrate anything to the con-

trary. Concentrating the litigation through class treatment is logical as well as desirable.

As discussed above, class members are ascertainable through objective criteria: Wells Fargo's own records of individuals who were assessed overdraft fees. As he did in *Gutierrez*, Plaintiffs' expert has proposed to identify members of the class by running queries in Wells Fargo's computer database. Such work will be ministerial in nature, and will not be plagued by unique class member issues. So too, damages will be calculated using the same Wells Fargo records used to identify the class members. These facts make these cases eminently manageable as a class action, and multiple individual lawsuits would be substantially less manageable in any event. *See Klay*, 382 F.3d at 1272.

The Court finds that Plaintiffs have met the superiority requirement of Rule 23(b)(3).

## C. Affirmative Defenses

■ Wells Fargo's affirmative defenses do not defeat class certification. Affirmative defenses must meet the pleading standards in *Iqbal* and *Twombly*. *See Castillo v. Roche Labs., Inc.*, No. 10–20876–CIV, 2010 WL 3027726, at *2, 2010 U.S. Dist. LEXIS 87681, at *5 (S.D.Fla. Aug. 2, 2010) (noting that "a majority of district courts in Florida have applied this heightened pleading standard to affirmative defenses"). A number of Wells Fargo's affirmative defenses are insufficiently pled because they are mere "labels and conclusions": compressed allegations formulaically reciting the elements of the affirmative defenses. *Id.* These defenses do not preclude certification.

Wells Fargo's affirmative defenses do not defeat certification for the additional reason that they raise common questions of proof that predominate over individualized issues. Many of the affirmative defenses require a party to have had *full knowledge* of the circumstances in order for the defense to prevail, including ratification,[10] waiver,[11] volun-

**10. Ratification:** *Thorstenson v. ARCO Alaska, Inc.*, 780 P.2d 371, 374–75 (Alaska 1989); *United Bank v. Mesa N.O. Nelson Co.*, 121 Ariz. 438, 590 P.2d 1384, 1386–87 (1979); *Adams v. Paine, Webber, Jackson & Curtis, Inc.*, 686 P.2d 797, 801 (Colo.App.1983); *Carpenter v. Payette Valley Co-op., Inc.*, 99 Idaho 143, 578 P.2d 1074, 1078 (1978); *Wing v. Lederer*, 77 Ill.App.2d 413, 222 N.E.2d 535, 538 (1966); *Hutter v. Weiss*, 132 Ind.App. 244, 177 N.E.2d 339, 344 (1961); *Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174, 179 (Iowa 1987); *Prather v. Colorado Oil & Gas Corp.*, 218 Kan. 111, 542 P.2d 297, 303 (1975); *Old Mortg. & Fin. Co. v. Pasadena Land Co.*, 241 Mich. 426, 216 N.W. 922, 926 (1928); *Anderson v. First Nat'l Bank,* 303 Minn. 408, 228 N.W.2d 257, 259 (1975); *Wilks v. Stone,* 339 S.W.2d 590, 595–96 (Mo.Ct.App.1960); *Erler v. Creative Fin. & Invs., LLC,* 349 Mont. 207, 203 P.3d 744, 752 (2009); *W. Fertilizer & Cordage Co. v. BRG, Inc.,* 228 Neb. 776, 424 N.W.2d 588, 595 (1988); *Cardinal v. C.H. Masland & Sons,* 87 Nev. 224, 484 P.2d 1075, 1079 (1971); *Armijo v. Nuchols,* 57 N.M. 30, 253 P.2d 317, 320 (1953); *Weisser v. Grand Forks Fed. Sav. & Loan Ass'n,* 406 N.W.2d 696, 700 (N.D.1987); *Bailey v. Midwestern Enters., Inc.,* 103 Ohio App.3d 181, 658 N.E.2d 1120, 1123 (1995); *Michel v. ICN Pharms., Inc.,* 274 Or. 795, 549 P.2d 519, 525 n. 2 (1976); *Stroh v. Town of Java,* 463 N.W.2d 923, 925 (S.D.1990); *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 536 (Tex.2002); *Franklin Credit Mgmt. Corp. v. Hanney,* 262 P.3d 406, 414–16 (Utah 2011); *Ladd v. Hildebrant,* 27 Wis. 135, 144 (1870); *Snohomish Cnty. v. Hawkins,* 121 Wash.App. 505, 89 P.3d 713, 716 (2004);

*McConnell v. Dixon,* 68 Wyo. 301, 233 P.2d 877, 891 (1951).

**11. Waiver:** *Carr–Gottstein Foods Co. v. Wasilla, LLC,* 182 P.3d 1131, 1138–39 (Alaska 2008); *Morris v. Maricopa Cnty. Adult Prob. Dept.,* 2008 WL 4149983, at *6 (Ariz.Ct.App. Feb. 14, 2008); *Adams,* 686 P.2d at 801; *First Sec. Bank of Idaho, N.A. v. Gaige,* 115 Idaho 172, 765 P.2d 683, 686 (1988); *Hensel v. Capital Live Stock Ins. Co.,* 219 Ill.App. 77, 81–82 (1920); *St. John v. Hendrickson,* 81 Ind. 350, 354 (1882); *Mills Cnty. State Bank v. Fisher,* 282 N.W.2d 712, 716 (Iowa 1979); *Kan. Wheat Growers' Ass'n v. Windhorst,* 129 Kan. 528, 283 P. 638, 641 (1930); *Couper v. Metro. Life Ins. Co.,* 250 Mich. 540, 230 N.W. 929, 931 (1930); *Cohler v. Smith,* 280 Minn. 181, 158 N.W.2d 574, 579 (1968); *Springfield Sec. Co. v. Boren,* 275 S.W. 566, 567 (Mo.Ct. App.1925); *Enter. Sheet Metal Works v. Schendel,* 55 Mont. 42, 173 P. 1059, 1061 (1918); *State ex rel. Wagner v. Amwest Sur. Ins. Co.,* 280 Neb. 729, 790 N.W.2d 866, 872 (2010); *Thompson v. City of N. Las Vegas,* 108 Nev. 435, 833 P.2d 1132, 1134 (1992); *Gauvey v. Hawkins,* 61 N.M. 131, 296 P.2d 302, 304 (1956); *Sadler v. Ballantyne,* 268 N.W.2d 119, 124 (N.D.1978); *N. Olmsted v. Eliza Jennings, Inc.,* 91 Ohio App.3d 173, 631 N.E.2d 1130, 1134 (1993); *Stanley v. Mueller,* 222 Or. 194, 350 P.2d 880, 887 (1960); *W. Cas. & Sur. Co. v. Am. Nat'l Fire Ins. Co.,* 318 N.W.2d 126, 128 (S.D.1982); *Murphy v. Canion,* 797 S.W.2d 944, 951 (Tex.App.1990); *Continental Ins. Co. v. Kingston,* 114 P.3d 1158, 1162 (Utah Ct.App.2005); *Lawson v. Helmich,* 20

tary payment,[12] and failure to mitigate.[13] *See TD Bank*, 281 F.R.D. at 678–79; *Union Bank*, 275 F.R.D. at 677–78 & n. 8. Plaintiffs allege, and offer evidence to show, that Wells Fargo promulgated misinformation and concealed material aspects of its overdraft scheme from its customers, including its invariable use of high-to-low debit posting and the rationale and effect of its "shadow line" and "commingling" practices. If Plaintiffs can prove these facts, they will undercut Wells Fargo's defenses through the use of common evidence. To the extent Wells Fargo could prove that some customers obtained full knowledge of Wells Fargo's scheme— which Plaintiffs deny occurred during the class period—yet continued to incur and pay overdraft fees, the presence of individualized defenses against a small number of class members would not destroy the predominance of common liability questions. *See Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir.2003); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 45 (E.D.N.Y.2008).

 Other affirmative defenses such as accord and satisfaction, ratification, and set-off pertain to damages, and can be accounted for in Plaintiffs' expert's calculations. *See*

*Union Bank*, 275 F.R.D. at 677 (setoff defense does not destroy predominance); *Carbajal*, 219 F.R.D. at 441 n. 2; *Allen v. Holiday Universal*, 249 F.R.D. 166, 177, 191 (E.D.Pa.2008). The Eleventh Circuit has made clear that individual issues relating to damages do not defeat class certification. *See Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir.2003), *aff'd*, 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005); *Sacred Heart*, 601 F.3d at 1178. Mitigation of damages, like the other damage-related affirmative defenses, is not barrier to class certification. *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 116 (S.D.N.Y.2010); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 244 F.R.D. 79, 87 (D.Mass.2007); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 347 (E.D.Mich.2001).

 Wells Fargo contends that class certification must be denied because there are individual issues regarding the application of various States' statutes of limitations as an affirmative defense. Courts consistently hold, however, that the statute of limitations does not bar class certification, even when individual issues are certain to exist.[14] As

Wash.2d 167, 146 P.2d 537, 542 (1944); *Milwaukee Boston Store v. Katz*, 153 Wis. 492, 140 N.W. 1038, 1050 (1913); *N.H. Fire Ins. Co. v. Boler*, 55 Wyo. 530, 102 P.2d 39, 43–44 (1940).

**12. Voluntary Payment:** *Moody v. Lloyd's of London*, 61 Ariz. 534, 152 P.2d 951, 953 (1944); *Skyland Metro. Dist. v. Mt. W. Enter., LLC*, 184 P.3d 106, 127 (Colo.App.2007); *Med. Recovery Servs., LLC v. Carnes*, 148 Idaho 868, 230 P.3d 760, 763 (2010); *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 667–71 (7th Cir.2001) (applying Illinois law); *Nat'l Fire Ins. Co. v. Butler*, 260 Iowa 1159, 152 N.W.2d 271, 273 (1967); *Montgomery Ward & Co. v. Williams*, 330 Mich. 275, 47 N.W.2d 607, 612 (1951); *Hanson v. Tele–Communs., Inc.*, 2000 WL 1376533, at \*3 (Minn.Ct.App. Sept. 26, 2000); *Sturdevant v. Mills*, 177 Mont. 137, 580 P.2d 923, 926 (1978); *Kunkel Auto Supply Co. v. Leech*, 139 Neb. 516, 298 N.W. 150, 152 (1941); *Randall v. Lyon County*, 20 Nev. 35, 14 P. 583, 584 (1887); *Rabbit Ear Cattle Co. v. Frieze*, 80 N.M. 203, 453 P.2d 373, 374 (1969); *Gold–Stabeck Loan & Credit Co. v. Kinney*, 33 N.D. 495, 157 N.W. 482, 486 (1916); *Scott v. Fairbanks Capital Corp.*, 284 F.Supp.2d 880, 894 (S.D.Ohio 2003); *Hammond v. Or. & C.R. Co.*, 117 Or. 244, 243 P. 767, 771–72 (1926); *Hood v. Sioux Steel Co.*, 67 S.D. 1, 287 N.W. 636, 639 (1939); *Tyler v. Tyler*, 742

S.W.2d 740, 743 (Tex.App.1987); *Snelgrove v. Earl*, 17 Utah 321, 53 P. 1017, 1019–20 (1898); *Indoor Billboard/Washington Inc. v. Integra Telecom of Washington, Inc.*, 170 P.3d 10, 23 (Wash. 2007); *Putnam v. Time Warner Cable of S.E. Wisc., L.P.*, 255 Wis.2d 447, 649 N.W.2d 626, 631–32 (2002); *Thurmon v. Clark*, 507 P.2d 142, 142–43 (Wyo.1973).

**13.** *Lane v. Kitzhaber*, 283 F.R.D. 587, 599 (D.Or. 2012); *City of Farmington Hills Emp. Retirement Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 353 (D.Minn.2012); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 116 (S.D.N.Y.2010); *New Eng. Carpenters Health Ben. Fund v. First DataBank, Inc.*, 244 F.R.D. 79, 87 (D.Mass.2007); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 347 (E.D.Mich.2001); *In re College Bound Consol. Litig.*, 1994 WL 236163, at \*3 (S.D.N.Y. May 31, 1994).

**14.** *Piscioneri v. Commonwealth Land and Title Ins. Co.*, Civ.A. No. 010764, 2004 N.Y. Misc. LEXIS 256, at \*1, \*27 (N.Y.Sup.Ct. Jan. 8, 2004) (finding that the affirmative defenses of estoppel, statute of limitations, and ratification did not prevent class certification because the central issue in the case was whether the class was harmed by the defendant's actions); *La Grasta v.*

one court recently observed, "Predominance is not defeated because the doctrines used by plaintiffs for 'tolling the statute of limitations,' such as the doctrine of fraudulent concealment, involve proof 'common to the defendants,' namely, 'the act of concealing' defendant's wrong. Indeed, '[c]ourts have been nearly unanimous ... in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action.'" *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 486 (C.D.Cal.2012) (citations omitted).

The dominant issue here, as it was in *Union Bank*, is whether Wells Fargo "engaged in a systematic scheme to extract the greatest possible number of overdraft fees from Plaintiffs and similarly situated [Wells Fargo] consumers across the country." 275 F.R.D. at 670. Plaintiffs' claims and those of the class can be determined by class-wide proof, and the Court finds Wells Fargo's affirmative defenses insufficient to defeat class certification.

### D. The Use of Subclasses

▆▆ The Court also finds that the creation of subclasses to address variations in state law is appropriate here and makes these cases manageable and suitable for class treatment. *See, e.g., Klay*, 382 F.3d at 1262 (noting that "if applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."). The Court:

> may authorize aggregate treatment of multiple claims, or of a common issue therein, by way of a class action if the court determines that
>
> (1) a single body of law applies to all such claims or issues;
>
> (2) different claims or issues are subject to different bodies of law that are the same in functional content; or

(3) different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court ... can manage by means of identified adjudicatory procedures.

American Law Institute, *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010). Complete uniformity of state law is not required so long as there are no material conflicts among the laws. *See Southern States Police Benev. Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 90–91 (D.Mass. 2007). The Court may certify multi-state classes even if "different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court ... can manage by means of" sub-classing. *Union Bank*, 275 F.R.D. at 679–80 (internal quotations omitted).

The proposed special verdict forms and supporting surveys of law submitted by Plaintiffs with their Trial Plan illustrate that the variations among the applicable state laws are not material and can be managed to permit a fair and efficient adjudication by the trier of fact. As detailed in Plaintiffs' Trial Plan, for their claims for breach of the covenant of good faith and fair dealing, Plaintiffs propose three subclasses. For unjust enrichment, Plaintiffs propose two subclasses. For unconscionability, three. In addition, there are two statutory subclasses covering New Mexico and Washington only. Each subclass will have its own start date linked to the statute of limitations for each of those claims. For the reasons stated above, common issues predominate with respect to each of these claims. As set forth below, the subclasses proposed by Plaintiffs involve materially identical legal standards and will facilitate the manageability of these actions on a class basis.

#### (i) Breach of the Contractual Covenant of Good Faith and Fair Dealing Claims

The glue that binds together these subclasses is the RESTATEMENT (SECOND) OF CON-

---

*First Union Sec., Inc.*, No. 2:01–251, 2005 U.S. Dist. LEXIS 20207, at *19–20, 30 (M.D.Fla. 2005); *Board of Trustees of the AFTRA Ret. Fund*

*v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 353 n. 129 (S.D.N.Y.2010).

TRACTS § 205 (1981), which each of the jurisdictions in question recognizes for the rule that the duty of good faith and fair dealing is implied in every contract. *See* Trial Plan at 12–14 & Exhibits cited therein. That some states may forbid a contractual covenant claim where the contract expressly permits the activity in question does not create material variations for the issues being certified. *See In re Telectronics Pacing Sys., Inc.,* 172 F.R.D. 271, 292 (S.D.Ohio 1997). Nor is an inquiry into the subjective state of mind of each customer's expectations or preferences necessary. The differences among the three subclasses can be summarized as follows: the states in Subclass 1 require a showing that the defendant acted in bad faith or engaged in unreasonable conduct that had the effect of preventing the plaintiff from receiving the benefits of the contract. The states in Subclass 2 require a showing that the defendant breached the contract by unfairly interfering with the plaintiff's rights to receive benefits thereunder. The lone state in Subclass 3 (New Mexico) requires showings that the defendant's conduct contravened the terms of the contract by unfairly interfering with the plaintiff's right to receive benefits thereunder, in a way that affected a fundamental purpose of the contract. The Court finds on these facts that the issues bearing on the wrongfulness of Wells Fargo's alleged conduct predominate within each proposed subclass and that this claim is appropriate for class treatment. Accordingly, the Court reaffirms that Plaintiffs have adequately alleged a claim for breach of the contractual covenant of good faith and fair dealing, and certifies these subclasses.

### (ii) Unjust Enrichment Claims

The Court previously ruled that Plaintiffs may proceed in the alternative on claims for unjust enrichment and breach of the contractual covenant of good faith and fair dealing. DE 305 at 32–33. As the Court noted, Wells Fargo may attempt to force an election of remedies (at law or in equity) through motion practice at an appropriate juncture, but the coexistence of these unjust enrichment claims with contractual claims does not affect the manageability of the class action itself. At their core, each unjust enrichment subclass flows from the principles enshrined in the RESTATEMENT (FIRST) OF RESTITUTION § 1 & cmt. a (1937). *See* Trial Plan at 14–15 & Exhibits cited therein. While the Court has previously discussed its view that unjust enrichment requires the same essential showing in every jurisdiction—the defendant unjustly obtained a benefit at the plaintiff's expense such that restitution is warranted— Plaintiffs here propose certifying two distinct subclasses, which is certainly appropriate. Specifically, the states in Subclass 1 require a showing that (i) the plaintiff conferred a benefit and (ii) the defendant accepted or retained it, (iii) under circumstances that make it unjust or inequitable for the defendant to retain the benefit. The states in Subclass 2 require an additional showing that the defendant "appreciated" the benefit, e.g., by drawing interest on it. As alluded to above, many courts have certified multi-state unjust enrichment claims under circumstances similar to those here. *See, e.g., Terazosin Hydrochloride,* 220 F.R.D. at 697 n. 40; *Mercedes II,* 267 F.R.D. at 119. The Court follows these sound authorities.

### (iii) Unconscionability Claims

Plaintiffs' Trial Plan also proposes three workable subclasses for their unconscionability claims, all of which derive from Section 2–302 of the Uniform Commercial Code. The only differences among the states' laws pertain to whether both procedural and substantive unconscionability are required. *See* Trial Plan at 15–16 & Exhibits cited therein. Subclass 1 includes states the law of which requires procedural and substantive unconscionability, and hence subsumes Subclass 3, which includes states which require either procedural or substantive unconscionability. The law in Subclass 2 states, meanwhile, requires only substantive unconscionability. At the hearing on class certification, Wells Fargo disputed the ability of Plaintiffs who reside in Subclass 3 states to adequately represent class members in Subclass 1 states. The Court disagrees, based on its assessment that the evidence here presents a strong case for both procedural unconscionability (focusing on bargaining power disparities and contract formation problems) and substantive unconscionability (focusing

on harsh, one-sided results). Because Plaintiffs in Subclass 3 can prevail by showing either one or the other, they will have every incentive to marshal the evidence that Wells Fargo's conduct was both procedurally and substantively unconscionable—the showing required for Subclass 1 to prevail.

The Court has previously addressed whether unconscionability may be pled as an affirmative claim. *See* DE 305 at 26 (concluding that while unconscionability is normally a defense, that is not uniformly true and in the circumstances of these cases, it is appropriate to permit it as an affirmative claim). The Court remains convinced that this conclusion is correct, and that the Court's equitable powers permit a declaration that Wells Fargo's contractual clauses purporting to reserve discretion to re-sequence debit card transactions from highest to lowest so as to maximize overdraft charges are unconscionable under each of the relevant states' laws. Again, the Court finds that Wells Fargo's customers' individual preferences, knowledge, and levels of sophistication are not relevant to this inquiry.

(iv) The Court further certifies a statutory subclass under the New Mexico consumer protection statute, N.M. Stat. § 57–12–3, which prohibits trade practices determined to be unfair, deceptive, or unconscionable, as those terms are defined in N.M. Stat. § 57–12–2.

(v) The Court similarly certifies a statutory subclass under the Washington consumer protection statute, Wash. Rev.Code § 19.86.020, which prohibits trade practices determined to be unfair or deceptive as injurious to the public interest, Wash. Rev.Code § 19.86.093.

\* \* \* \* \* \*

Lastly, Wells Fargo maintained at the class certification hearing that the Court should not certify subclasses represented by Plaintiffs from various underlying actions on the basis that the Court must remand each action to its originating jurisdiction at the close of pretrial proceedings. However, each and every subclass possesses a materially identical legal claim and is headed up by Bank customers who share that claim and have ample incentive to prosecute it. There

are no "headless" subclasses, and customers in every state in which Wells Fargo did business (except Indiana, which is excluded), stand to recoup their allegedly excessive overdraft fees through at least one cause of action. The Court's plan appropriately protects the interests of all class members to the extent feasible, given these named Plaintiffs and state laws, while also affording Wells Fargo the ability to defend itself in every instance. Rule 23 calls for nothing more.

The MDL mechanism, like Rule 23, aims to promote the just and efficient resolution of related civil actions. 28 U.S.C. § 1407. Congress created the MDL process to satisfy the need for judicial authority to manage matters of substantial controversy which, absent coordination, could "disrupt the functions of the Federal Courts." H.R.Rep. No. 1130, 90th Cong., 2d Sess. 1 (1968), reprinted in 1968 U.S.C.C.A.N. 1898, 1899 (Feb. 28, 1968). The MDL system is accordingly framed to ensure that related cases will receive "uniform and expeditious treatment," with the Court enjoying "broad discretion to structure a procedural framework for moving the cases as a whole as well as individually"; an MDL truly witnesses "a special breed of complex litigation where the whole is bigger than the sum of its parts." *In re PPA Prods. Liab. Litig.*, 460 F.3d 1217, 1230–32 (9th Cir.2006) (citation omitted); *accord Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 432 (5th Cir.2013) (affirming the MDL court's "flexible" case management strategies and "extensive supervision and control" to promote efficient resolution of a large controversy) (citations omitted). These principles strongly support the Court's approach here.

It is not only these core principles, but also this Court's ability to exercise its discretion pragmatically and prudently to sequence trials and to remand discrete subclasses for trial, that counsel in favor of the Court's determination herein. *See generally* Fed. R.Civ.P. 16(c) (authorizing the court to adopt special procedures, including ordering separate trials where appropriate on claims or issues). Other case management mechanisms—e.g., amended pleadings in the originating jurisdictions to add Plaintiffs from

another coordinated case or otherwise—are available to ensure the just and efficient resolution of this controversy. Decisions on what will be tried where and when will be left for another day. For purposes of Rule 23, these subclasses are reasonable and manageable because they group together materially identical claims to be pursued by qualified representatives who have demonstrated their firm commitment to seek relief both for themselves and for the similarly situated Wells Fargo customers.

For all the foregoing reasons, the Court certifies Plaintiffs' proposed subclasses, as defined in the table below.

### CONCLUSION

After careful consideration, and being fully advised as set forth above and in accordance with the findings herein, it is hereby

**ORDERED, ADJUDGED, AND DECREED** as follows:

1. Plaintiffs' Motion for Class Certification **(DE 3262)** be, and the same is, hereby **GRANTED.** The Court certifies the following class.

All Wells Fargo customers in the United States, excluding the States of California and Indiana, who had or have one or more consumer accounts and who, from applicable statutes of limitation through August 13, 2010 (the "Class Period"), incurred one or more overdraft fees as a result of Wells Fargo's practice of sequencing debit card transactions from highest to lowest, except for such overdraft fees incurred by former Wachovia customers pursuant to Wells Fargo carrying out the practices and policies of Wachovia.

Excluded from the Class are Wells Fargo; its parents, subsidiaries, affiliates, officers and directors; any entity in which Wells Fargo has a controlling interest; all customers who make a timely election to be excluded; and all judges assigned to this litigation and their immediate family members.

2. The Court appoints Plaintiffs Marc Martinez, Ivy Graham, Dolores Gutierrez, Karen and Edward Wickman, Michael Dehn, Alex Zankich, and William Rucker as representatives of the class, and as representatives of the following certified subclasses.

| Subclass | States Included | | Representative Plaintiffs |
|---|---|---|---|
| Good Faith and Fair Dealing Subclass # 1 | Arizona Oregon | Nevada Wisconsin | Dolores Gutierrez Karen and Ed Wickman |
| Good Faith and Fair Dealing Subclass # 2 | Idaho Montana South Dakota Washington | Michigan North Dakota Utah Wyoming | Alex Zankich William Rucker Michael Dehn |
| Good Faith and Fair Dealing Subclass # 3 | New Mexico | Marc Martinez Ivy Graham | |
| Unjust Enrichment Subclass # 1 | Michigan New Mexico | Nebraska | Marc Martinez Ivy Graham |
| Unjust Enrichment Subclass # 2 | Alaska Oregon Wisconsin | Idaho Washington Wyoming | Dolores Gutierrez Karen and Ed Wickman Alex Zankich William Rucker Michael Dehn |
| Unconscionability Subclass # 1 | Alaska Idaho Michigan Nebraska Ohio Texas Wyoming | Colorado Iowa Montana North Dakota South Dakota Wisconsin | Marc Martinez Ivy Graham Alex Zankich William Rucker Michael Dehn |
| Unconscionability Subclass # 2 | Minnesota | Oregon | Dolores Gutierrez Karen and Ed Wickman |

| | | | |
|---|---|---|---|
| Unconscionability Subclass # 3 | Arizona New Mexico Washington | Illinois Utah | Marc Martinez Ivy Graham Alex Zankich William Rucker Michael Dehn |
| New Mexico Statutory Subclass | New Mexico | | Marc Martinez Ivy Graham |
| Washington Statutory Subclass | Washington | | Alex Zankich William Rucker Michael Dehn |

3. The Court also appoints the following firms as class counsel pursuant to Fed. R.Civ.P. 23(g): Podhurst Orseck, P.A.; Bruce S. Rogow, P.A.; Grossman Roth, P.A.; Lieff Cabraser Heimann & Bernstein LLP; Webb, Klase & Lemond, LLC; Trief & Olk; Baron & Budd, P.C.; and Golomb & Honik, P.C.[15]

---

**15.** The Court will separately address the procedure for providing notice to class members re-garding the certification of the class and these claims.